# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

_____

No. 90-7038
No. 90-7070
_____

ROYAL INSURANCE COMPANY OF AMERICA and ROYAL LLOYDS OF TEXAS,

Plaintiffs-Appellees,

VERSUS

QUINN-L CAPITAL CORPORATION, et al.,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Texas
_____

(May 5, 1992)

Before WISDOM, DAVIS, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

The district court enjoined the appellants from pursuing their suit in state court; the appellants contend that the injunction violates the Anti-Injunction Act ("the Act"), 28 U.S.C. § 2283. We find that the portion of the injunction based upon the "relitigation" exception to the Act was proper. We further find that the portion of the injunction based upon the "in aid of jurisdiction" exception was improper. We therefore affirm in part, reverse in part, and remand.

In May 1987, some 157 investors ("the investors") brought twenty-six lawsuits in federal district court against numerous Quinn-L entities ("Quinn-L") and other parties. The investors, who alleged that they had lost money in various real estate investments offered or managed by Quinn-L, asserted claims under federal securities and anti-racketeering laws as well as Texas law. The cases were assigned to Judge Barefoot Sanders, who consolidated them ("the federal liability suit").

Subsequently, Quinn-L asked Royal Insurance Company of America and Royal Lloyds of Texas (collectively "Royal") to defend it in the federal liability suit pursuant to several insurance policies it had issued to Quinn-L. Royal agreed to do so but reserved its right to contest coverage. On May 10, 1988, Royal filed a declaratory judgment action ("first federal declaratory judgment action"), asking the court to determine whether Royal had a duty to defend or indemnify Quinn-L against the investors' claims brought in the federal liability suit. This declaratory judgment action also was assigned to Judge Sanders.

On June 6, the investors moved to intervene in the federal declaratory judgment action SQ a motion Royal opposed. The court denied the motion on the ground that the investors had failed to meet the requirements for intervention as of right and that their interest would be protected adequately by Quinn-L.

Royal moved for partial summary judgment on December 12, 1988. While this motion was pending, the investors entered into a

settlement agreement dated April 5, 1989, with Mark Lovell, the sole shareholder of all but one of the Quinn-L entities.[1] Lovell promised to cooperate with the investors in the litigation against Quinn-L and to assign to them any claims he might have against Royal; in return, the investors promised not to pursue any claims against him.[2] The district court found that "settlement negotiations between the Investors' counsel and Lovell started as early as June, 1988 and resulted in a letter agreement by October 11, 1988." Royal Ins. Co. of Am. v. Quinn-L Capital Corp., 759 F. Supp. 1216, 1224 n.10 (N.D. Tex. 1990) ("Royal"). It also found that the "sole purpose" of this agreement was to pursue Royal. Id. at 1224.

On April 14, 1989, the court granted Royal's partial summary judgment motion, concluding that Royal's policies did not impose any duty to defend or indemnify Quinn-L against the investors' claims in the federal liability suit. The court held that

> the language of the insurance coverage is unambiguous . . . . As a matter of law, the allegations in the pending suits do not state claims within coverage. Although the investors allege loss of their investments, they allege no injury to tangible property which could constitute an "occurrence". Additionally, none of the losses constitutes "property damage" as required by the policy. [Footnote and citation omitted.]

The court added that "[n]either have Defendants shown that personal

---

[1] The exception is Quinn-L Capital Corporation. Lovell is the sole owner of all of its voting stock and is the beneficial owner of all of its assets.

[2] At this point, Lovell was not a party to the federal liability suit. The investors had, however, objected to the discharge of their claims in Lovell's personal bankruptcy proceeding.

3

injuries (in the form of mental anguish) were caused by an `occurrence'." The court formally entered partial summary judgment in favor of Royal on April 27.

On May 4, Quinn-L notified the district court regarding the status of the litigation. It stated that in view of the partial summary judgment, no issues remained to be litigated aside from attorneys' fees.

The investors moved to dismiss all their pending actions against Quinn-L on August 3, stating that they and Quinn-L had "reached an agreement in principle for settlement of [their] claims and anticipate reaching an agreement as to the precise terms and conditions of settlement over the next few weeks" and requesting the dismissal in order to "further streamline the litigation pending in this Honorable Court." On August 28, the court dismissed the federal liability suit in its entirety, dismissing the federal claims with prejudice and SQ declining to exercise pendent jurisdiction SQ dismissing the state claims without prejudice.

The court entered a final judgment on the federal declaratory action on September 8. At that time, the court again held that Royal had no duty to defend or indemnify Quinn-L for any claims brought in the federal liability suit. This judgment was not appealed.

Approximately five days later, the investors filed suit against Quinn-L in state court in Dallas County, based upon the same events and conduct at issue in the just-dismissed federal

4

liability suit. In October, Lovell, on behalf of Quinn-L, directed his personal attorney to request that Royal defend Quinn-L in the Dallas County litigation. Royal offered to provide a defense subject to a reservation of rights SQ the same offer it had made in relation to the federal liability suit.

While awaiting Quinn-L's response, Royal retained an attorney, Coyt Randal Johnston, to represent Quinn-L in the Dallas County case. Because Royal had not received a response from Quinn-L regarding its offer of a qualified defense, Johnston entered a general denial on November 17.

On January 9, 1990, Lovell rejected Royal's offer and demanded an unqualified defense. As the district court later found, "[t]he evidence conclusively establishes that Lovell, on behalf of the Quinn-L Entities, refused Royal's offer of a defense subject to a reservation of rights at the urging of the Investor Plaintiffs." Royal, 759 F. Supp. at 1224.[3] Royal declined to acknowledge coverage and instructed Johnston to take no further action in the Dallas County action.

Royal repeatedly notified Lovell and his personal attorney that Johnston would no longer take any action in that suit. In a

---

[3] In a deposition taken on October 18, 1990, Lovell stated:

There was certainly an offer of some type of a defense offered me by Royal or to the companies. I had gone through a similar situation like that with Royal on other situations [i.e., in the federal liability action]. And for two reasons, one, my own and, two for the purposes as part of my settlement agreement with the [investors], I advised to keep them informed.

I refused to accept a settlement or a defense unless there was a full defense. Coverage, I guess, is what it is. I would still maintain that because of those two things that I just mentioned.

5

letter dated April 24, Johnston warned them of the "significant risk" of default if they failed to retain new counsel.

On May 16, Johnston filed his motion to withdraw, which was granted on May 30. On May 21, while Johnston's withdrawal motion was pending, the investors served Quinn-L (through Johnston) with numerous requests for admissions. Johnston answered the requests, denying the majority of them. On June 27, the investors moved to strike the responses on the ground that Johnston had prepared them without his client's input. On July 6, a visiting judge granted the investors' unopposed motion to deem the denied requests "admitted."[4]

The Dallas County litigation proceeded to trial the first week of August; Quinn-L did not make an appearance. Based solely upon the deemed admissions obtained by the investors, the court entered a default judgment against Quinn-L in the amount of $741 million, including "actual damages consisting of [lost] investment, . . . damages for bodily injury including mental pain, suffering and anguish which has manifested itself physically," attorneys' fees, and exemplary damages "in an amount equal to treble the actual damages suffered by each Plaintiff."

On September 4, Quinn-L (through Lovell) assigned its rights and causes of action against Royal to the investors. In exchange, the investors agreed to pay (1) Quinn-L ten dollars, and (2) Lovell

---

[4] In their brief, the appellants note that "[b]y this time, Johnston finally had withdrawn from Quinn-L's defense. Quinn-L, however, was unable financially to hire its own counsel to defend the suit, and, therefore, was unrepresented and did not participate further."

6

five percent of any future recoveries against Royal in excess of the $741 million default judgment.[5]

On the same day the assignment was executed, the investors filed suit against Royal in state court in Cameron County, bringing claims in two capacities. As assignees of Quinn-L, the investors brought tort, waiver, and estoppel claims based upon Royal's handling of the Dallas County litigation. As judgment creditors, the investors sought recovery of the Dallas County judgment under the applicable insurance policies. On September 17, the investors filed a second action in Cameron County seeking a declaration of coverage for the damages awarded in the Dallas County judgment.

The Cameron County litigation proceeded at an accelerated pace. The day after suit was filed SQ before Royal had even been served SQ the court set a trial date of December 10. This was in violation of the court's rules, which provide that a case will be set for trial only after the filing of an answer. See Cameron County Civ. Ct. R. 1.5(a). On October 12, the investors filed a motion for summary judgment, which was set for hearing on November 8.

The present action stems from Royal's attempt to enlist the federal district court's aid in enforcing the September 1989 declaratory judgment issued in its favor. On March 9, 1990, while the Dallas County action was pending, Royal filed this suit in

---

[5] In the Cameron County action, discussed infra, the investors seek to treble the amount of the default judgment. Lovell's share of the potential $2.2 billion judgment would be some $74 million. See Royal, 759 F. Supp. at 1226 n.13.

7

federal court (again, before Judge Sanders) seeking a declaratory judgment that would establish that it had no duty to defend or indemnify Quinn-L in the Dallas County litigation.

Quinn-L filed an answer on August 15. It asserted as affirmative defenses, inter alia, those claims the investors would bring on September 4 in the Cameron County litigation as Quinn-L's assignees (i.e., the tort, waiver, and estoppel claims). On September 4, Royal moved to add the investors as defendants.

On October 30, Royal asked the federal court to issue a preliminary injunction against further prosecution of the entire Cameron County litigation. After a hearing, the court granted Royal's request. The court found that

> [t]o state the facts bluntly but fairly, the Investor Plaintiffs bought Lovell's cooperation with their April 5, 1989 Agreement and through their collusion with Lovell obtained an enormous default judgment against Lovell's companies.

759 F. Supp. at 1226. The appellants now ask us to reverse the district court's order granting Royal's request for a preliminary injunction.

Prior to oral argument of this case, the appellants filed a petition for writ of prohibition, and in the alternative, a motion for a stay, to prevent the district court from considering any other aspects of this case pending their appeal of the preliminary injunction. We denied their requests on September 9, 1991. Oral argument was held on October 2.

On October 29, the appellants asked this court to reconsider its earlier denial of the stay. On December 20, while this motion

8

was pending, the district court (1) denied the appellants' motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(7); (2) denied their motion for continuance and reopening of discovery; (3) granted Royal's motion for summary judgment on the appellants' affirmative defenses of tort, waiver, and estoppel; and (4) deferred consideration of Royal's application for permanent injunctive relief, pending this appeal. On December 24, the appellants asked us to "vacate all orders entered by the court below during the pendency of the improperly issued preliminary injunction, including the December 20, 1991 summary judgment order." Thus, in addition to the propriety of the district court's preliminary injunction, we consider the appellants' request to vacate the district court's orders of December 20.

## II.

First, the appellants challenge the district court's subject matter jurisdiction over the present controversy. They argue that the requirement of complete diversity is absent, see Carden v. Arkoma Assocs., 494 U.S. 185, 187 (1990) (citing Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267 (1806)), as Royal Lloyds of Texas, one of the plaintiffs, is a Texas citizen, as are several of the defendants. They also question whether the district court had jurisdiction over the first declaratory judgment action.

### A.

Royal Lloyds of Texas is an unincorporated association of

9

insurance underwriters. Citizenship of such an unincorporated association is determined by the citizenship of its "members." Id. at 195-96. None of the underwriters is a Texas citizen.[6] Texas law, however, requires that "Lloyd's Plan" insurers such as Royal Lloyds of Texas designate "an attorney in fact or other representative[]" to execute "[p]olicies of insurance." Tex. Ins. Code Ann. art. 18.01-1. The attorney-in-fact must be a citizen of Texas, see id. art. 18.02, and Royal Lloyds of Texas's attorney-in-fact is Royal Lloyds, Inc., a Texas corporation.

The appellants argue that as attorney-in-fact, Royal Lloyds, Inc., is a "member" of the unincorporated association of Royal Lloyds of Texas. Royal disagrees, arguing that an attorney-in-fact is a mere agent of the underwriters, not a member. We need not resolve this question, however, for the district court could exercise ancillary jurisdiction over this controversy regardless of the citizenship of the parties.

It is well settled that a federal district court can exercise ancillary jurisdiction over a second action in order "to secure or preserve the fruits and advantages of a judgment or decree rendered" by that court in a prior action. Southmark Properties v. Charles House Corp., 742 F.2d 862, 868 (5th Cir. 1984) (quoting Local Loan Co. v. Hunt, 292 U.S. 234, 238 (1934)). Such jurisdiction is appropriate where the effect of an action filed in state court would "effectively nullif[y]" the judgment of a prior

_____

[6] According to Royal, the Royal Lloyds of Texas underwriters are citizens of New York and North Carolina.

10

federal action.  Id.  This is true even where the federal district court would not have jurisdiction over the second action if it had been brought as an original suit.  Local Loan Co., 292 U.S. at 238; Southwest Airlines Co. v. Texas Int'l Airlines, 546 F.2d 84, 89-90 (5th Cir.), cert. denied, 434 U.S. 832 (1977).

As discussed more fully infra, Royal returned to federal court in order to prevent the appellants from robbing it of the "fruits and advantages" of the federal declaratory judgment rendered in its favor.  Because both the Dallas County and Cameron County litigation had the potential of "effectively nullify[ing]" the previous declaratory judgment, we conclude that the district court had ancillary jurisdiction over the present controversy.

B.

The appellants also argue that the district court did not have subject matter jurisdiction over the first declaratory judgment action.  From this they conclude that Royal should not be able to bootstrap its way into federal court by filing a second action that depends upon a prior action over which the district court had no jurisdiction.

The appellants, however, cannot launch such a collateral attack of the district court's subject matter jurisdiction.  As the Supreme Court has stated,

> A party that has had an opportunity to litigate the
> question of subject-matter jurisdiction may not . . .
> reopen that question in a collateral attack upon an
> adverse judgment.  It has long been the rule that
> principles of res judicata apply to jurisdictional
> determinations SQ both subject matter and personal.

11

*Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 n.9 (1982) (citations omitted).

The question is not whether the issue of subject matter was actually litigated, but instead whether the parties had the opportunity to raise the question. *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1053 (5th Cir. 1987). If the parties against whom judgment was rendered did not appeal, the judgment becomes final and the court's subject matter jurisdiction is insulated from collateral attack. *Id.* *See also* *Donovan v. Mazzola*, 761 F.2d 1411, 1416 n.2 (9th Cir. 1985).

The final judgment in the first declaratory action was not appealed. The subject matter jurisdiction of the district court thus is not subject to collateral attack.[7]

## III.

The appellants next contend that the preliminary injunction violates the Anti-Injunction Act, 28 U.S.C. § 2283, which provides,

> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

---

[7] The investors respond that this is not a "collateral attack" because they were not parties to the first declaratory action (their motion to intervene having been denied). Thus, they argue, they had "no opportunity to litigate subject matter jurisdiction." As a preliminary matter, the investors, as assignees of Quinn-L, would stand in no better position than Quinn-L, which is bound by the earlier judgment. In addition, as developed more fully *infra*, the investors are also bound to the first declaratory judgment as judgment creditors, for they were "virtually represented" by Quinn-L during the first declaratory judgment action. *See* *infra* part III.A.3.

12

The district court utilized the second and third exceptions to enjoin two different types of claims at issue in the Cameron County litigation.

First, it used the "protect or effectuate" judgments, or "relitigation," exception to enjoin the investors' claims brought as judgment creditors. 759 F. Supp. at 1235. These "direct" claims were brought under the policy to recover damages up to the policy limits. The district court found that it had decided the issue of "coverage" under the language of the applicable Royal policies in the first declaratory judgment action, id. at 1234, and that therefore any attempt to relitigate the coverage issue SQ such as an attempt to recover under the policy language SQ was barred. Id. at 1235.

Second, it enjoined the remaining tort, waiver, and estoppel claims under the "in aid of jurisdiction" exception. These claims, which depend upon conduct and events that occurred after the issuance of the first declaratory judgment, were brought by the investors as assignees of Quinn-L. The district court enjoined the pursuit of these "post-declaratory judgment" claims, which were also before the district court as affirmative defenses to Royal's second declaratory judgment action, on the ground that "absent the injunctive relief sought by Royal, the [Cameron County court] could irreparably injure the [district court's] ability to decide the present case." Id. We will consider the two separate facets of the preliminary injunction in turn.

13

A.

The relitigation exception was "designed to permit a federal court to prevent state litigation of an issue that previously was presented to and decided by the federal court." Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 147 (1988). The exception is grounded in principles of res judicata and collateral estoppel. Id. An "essential prerequisite" for application of the relitigation exception "is that the claims or issues which the federal injunction insulates from litigation in state proceedings actually have been decided by the federal court." Id. at 148. See also Texas Employers' Ins. Ass'n v. Jackson, 862 F.2d 491, 501 (5th Cir. 1988) (en banc), cert. denied, 490 U.S. 1035 (1989).

In determining which issues have been "actually decided," the emphasis is on the record and on what the earlier federal court actually said, not on the court's post hoc judgment as to what the previous judgment was intended to say. Chick Kam Choo, 486 U.S. at 148. Any doubt as to whether the order precludes subsequent claims must be resolved in favor of allowing the state court to proceed. Jackson, 862 F.2d at 499.

This analysis requires us to compare the issues "actually decided" by the district court in the first federal declaratory judgment action with the issues raised in the direct contractual obligation claim brought by the investors in Cameron County.

14

1.

Royal's contractual obligations rest on the policy language[8] in question, which requires it to

pay on behalf of [Quinn-L] all sums which [it] shall become legally obligated to pay as damages because of

(A) bodily injury or
(B) property damage

to which this insurance applies, caused by an occurrence . . . .

"Occurrence" is defined as

[a]n accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

In its final judgment disposing of the declaratory judgment action dated September 8, 1989, the court stated,

1. The allegations in the pending[] suits do not allege an "occurrence," as defined by the policies;

2. The allegations in the pending suits do not allege[] "property damage," or "personal injury" as defined by the policies;

3. Petitioners, Royal Insurance Company of America and Royal Lloyds of Texas, have no duty to defend the Defendants in the pending suits . . . .

The appellants first argue that the federal declaratory judgment has little or no binding effect because it was a "specific declaration with respect to existing pleadings that were subject to change before, during, or even after trial." The appellants then stress that the final judgment "declares nothing with respect to

_____

[8] Although numerous policies were at issue throughout the federal and state litigation, the parties agree that this is the essential policy language.

15

Royal's obligations should the pleadings be amended, let alone with regard to a different lawsuit not even pending at the time the declaration issued." In other words, the declaratory judgment should be read as applicable only to those pleadings pending before the district court at the time.

Taken to its logical extreme, this argument defeats itself. Under appellants' rule, the losing party could defeat an adverse declaratory judgment by changing one word of its pleadings and filing them in state court. We thus reject the appellants' construction of the declaratory judgment as artificial and unnecessarily formalistic.[9]

Instead, we give the district court's decision a more natural reading. Based upon the language of the policy, there must be an occurrence and an injury in order for there to be coverage. In this case, the district court found that the investors' injuries SQ as alleged in the complaint SQ were not caused by an occurrence. Without an occurrence, there could be no coverage, and thus there was no duty to defend.[10] In sum, the district court did not simply

---

[9] The appellants indeed take their argument to the logical extreme. Focusing upon the district court's use of the "pending suits" language, the appellants contend that the declaratory judgment has no meaning because there were no liability suits pending before the district court at the time (The federal liability suit had been dismissed by the court on August 28; the final declaratory judgment action was issued on September 8.) We again reject appellants' needless formalism.

[10] The appellants reject this reading of the policy. They emphasize the policy's definition of "occurrence." They conclude that in order for there to be an occurrence, there must be an accident and injury. From this, they argue that the district court did not necessarily conclude that there was no accident, but rather could have based its "no occurrence" finding on "no injury" SQ i.e., no mental anguish.

This argument neglects the fact that the district court, in order to find that Royal had no duty to defend the federal liability suit, was obligated to consider the investors' claims of mental anguish. An insurer may

16

decide whether the investors had alleged "injury" caused by an "occurrence," but instead necessarily determined that the investors' allegations did not fit within the coverage of the policy language.[11]

---

be excused from its duty to defend only if "no state of facts could be proved" that would come within the policy coverage. Green v. Aetna Ins. Co., 349 F.2d 919, 926 (5th Cir. 1965). Thus, as Royal argues, "the court could not properly have ignored the Investors' allegations of personal injury SQ which had long been before it in Quinn-L's counterclaim and summary judgment briefs, in the Investors' proposed amended petitions, and in the Investors' representation that such injuries were `subsumed in' their previously asserted claims . . . ." The district court could not, as a matter of law, rule that the investors suffered no bodily injury, for that would be a disputed factual issue. The only decision it could make, as a matter of law, would be that whatever the injuries, they were not caused by an occurrence or accident. And this is what the court did indeed conclude in its April 14, 1989, partial summary judgment order when it stated that the "Defendants [failed to show] that personal injuries (in the form of mental anguish) were caused by an `occurrence'." See infra n.11.

[11] This conclusion is further supported by the district court's order of April 14, 1989. In its memorandum opinion and order, which awarded partial summary judgment in Royal's favor, the district court stated,

> The Court finds that the language of the insurance coverage is unambiguous . . . . As a matter of law, the allegations contained in the pending suits do not state claims within coverage. Although the investors allege loss of their investments, they allege no injury to tangible property which could constitute an "occurrence".[3] Additionally, none of the losses constitutes "property damage" as required by the policy.
>
> --------------
> [3] Neither have Defendants shown that personal injuries (in the form of mental anguish) were caused by an "occurrence".

[Citation and footnote omitted.] In other words, the investors suffered "no injury" SQ either to property or in the form of mental anguish SQ that "could constitute an `occurrence'" within the terms of the policy.

We recognize that orders of partial summary judgment, standing by themselves, have no preclusive effect, as they are interlocutory. Avondale Shipyards, Inc. v. Insured Lloyd's, 786 F.2d 1265, 1269-72 (5th Cir. 1986). Avondale, however, does not prevent us from considering the preclusive effect of the summary judgment order in this case.

As we noted in Avondale, the partial summary judgment order in that case had no preclusive effect because the final judgment "made no direct or indirect reference whatever to the [prior] partial summary judgment or to prior orders in general . . . ." Id. at 1272. By contrast, the September 8 final judgment explicitly states that Royal "move[s] this Court to enter this Final Judgment against [Quinn-L] in light of the Court's ruling on [Royal's] Motion for Partial Summary Judgment." The "partial" summary judgment was "partial" in name only. It decided the major issues in the case and entry of the final judgment was a mere formality.

17

The cases cited by the appellants discussing the complaint-allegation rule are not to the contrary. It is true that "[u]nder Texas law, the insurer's duty to defend is determined solely from the face of the pleadings and without reference to facts outside of the pleadings." Rhodes v. Chicago Ins. Co., 719 F.2d 116, 119 (5th Cir. 1983). Application of this "complaint-allegation" rule "gives rise to a duty to defend if one or more of the plaintiff's claims, `if taken as true, [are] sufficient to state a cause of action . . . coming within the terms of the policy.'" Id. (citation omitted).

But simply because the duty to defend is determined on the face of the complaint, and not with reference to the truth or falsity of the allegations contained therein, does not mean that the preclusive effect of a declaration of no duty to defend must be limited to the precise allegations contained in the pleadings. In this case, the district court determined the issue of coverage SQ that no "occurrence" had befallen the investors within the terms of the policy SQ and this determination can be applied to allegations in subsequent complaints.[12]

---

[12] The appellants argue that the district court erroneously applied principles of claim preclusion, as opposed to issue preclusion, in coming to this conclusion. Although the court did mention claim preclusion in its opinion, its analysis of the first declaratory judgment plainly states that "the Court finally interpreted the language in certain policy clauses, and the issue of the meaning of those clauses was necessary and essential to the Court's Judgment," 759 F. Supp. at 1234 (emphasis added) SQ language of issue preclusion. We therefore disagree with the appellants that the district court ran afoul of Jackson. See Jackson, 862 F.2d at 501 (noting that "true" res judicata, or claim preclusion, "appears to be inconsistent with Chick Kam Choo's admonishment that the relitigation exception `is strict and narrow' so that only `claims or issues which . . . actually have been decided' in the prior proceeding as reflected by what the prior `order actually said' are protectable thereunder" (citation omitted)).

18

2.

We now must compare the foregoing interpretation of the district court's final judgment with the investors' claims in the Cameron County litigation. In their original petition, the investors allege the following:

> 29. The injuries suffered by Plaintiffs as a result of Quinn-L Entities['] conduct, for which damages have been awarded by [the Dallas County] Judgment <u>are injuries which are covered</u> by the relevant insurance policies issued by Defendants The Royal Insurance Group . . . .

> 30. The allegations of Plaintiffs' complaint in [the Dallas County petition] <u>stated an "occurrence" which had resulted in "property damage" or "bodily injury</u>," as defined by the insurance policies . . . . The Quinn-L E[n]tities' conduct . . . has caused the Plaintiffs property damage and bodily injury and, therefore, the Defendants are responsible for the payment of the Judgment entered therein.

> . . .

> 32. [Royal is] liable directly to Plaintiffs, as judgment creditors under the [Dallas County judgment]. The Plaintiffs, judgment creditors, would further allege that [Royal is liable] to them for the entirety of the judgment rendered [in the Dallas County judgment] against the Quinn-L Entities . . . <u>for the reason that the policies of insurance purchased by Quinn-L Entities provide coverage for the injuries caused to Plaintiffs by the Quinn-L entities and upon which judgment was granted by the [Dallas County court]</u>. [Emphasis added.]

Given that the investors allege that the Dallas County judgment would be covered by the policy language, the question is whether the investors, after the issuance of the first federal declaratory judgment, amended their pleadings in such a way as to bring their claims within policy coverage. Indeed, the investors argue that they substantially altered their claims between September 8 (the date the district court entered its final

19

declaratory judgment) and September 14 (the date the investors refiled their state claims in Dallas County state court).

The crucial difference, they argue, is that in the Dallas County action they "alleged mental anguish caused by Quinn-L's negligence and gross negligence" in making a number of improper management decisions.[13]  They argue that in the first declaratory judgment action, the sole dispute was over whether the investors alleged mental anguish.  In the words of the appellants, "the declaratory judgment only decided that the then pending action did not allege mental anguish."

As noted above, however, the declaratory judgment did more than that.  The appellants' reading of the judgment simply ignores the fact that the court held that "allegations in the pending[] suits do not allege an `occurrence,' as defined by the policies." Thus, the only way that the appellants could overcome the declaratory judgment hurdle was to allege, in the Dallas County petition, a basis for finding an occurrence.

The allegedly improper acts on Quinn-L's part, however, remained constant from the federal liability suit to the Dallas County suit.  Thus, the district court's determination of the coverage issue would dispose of the appellants' claims to recover

---

[13]  In the Dallas County petition, the investors alleged that "Plaintiffs' . . . injuries and damages were proximately caused by the negligent conduct of Defendant in," among other things, "improperly treating all partnerships and companies as one entity for financial purposes," "syndicating partnerships while having lack of the financial wherewithal to fund the cash needs of the partnerships," and "improperly managing and structuring the companies and partnerships and thereby creating tax problems with the IRS concerning various entities."  These improper acts caused the investors to "suffer[] bodily injury, including mental pain, suffering and anguish."

20

under the policy language.  We therefore affirm the district court's injunction of the appellants' direct contractual claims under the relitigation exception.

3.

The investors respond that they cannot be bound by the first declaratory judgment because they were not parties to the action (their motion to intervene having been denied).  We have recognized, however, that "it is within the discretion of a district court to expand the scope of an otherwise valid injunction issued pursuant to the relitigation exception of the Anti-Injunction Act to include those in privity with parties to the federal court action."  Quintero v. Klaveness Ship Lines, 914 F.2d 717, 721 (5th Cir. 1990), cert. denied, 111 S. Ct. 1322 (1991).

Indeed, a non-party will be considered "in privity, or sufficiently close to a party in the prior suit so as to justify preclusion," where the party to the first suit is so closely aligned with the nonparty's interests as to be his "virtual representative."  Benson & Ford, Inc. v. Wanda Petroleum Co., 833 F.2d 1172, 1174-75 (5th Cir. 1987).  See also Aerojet-Gen. Corp. v. Askew, 511 F.2d 710, 719 (5th Cir.), cert. denied, 423 U.S. 908 (1975).  In order for virtual representation to arise, however, there must be "an express or implied legal relationship" between the party and the nonparty "in which [the] part[y] to the first suit [is] accountable to [the] non-part[y] who file[s] a subsequent suit raising identical issues."  Benson & Ford, 833 F.2d at 1175

21

(citation omitted).

The question of "whether a party's interests in a case are virtually representative of the interests of a nonparty is one of fact for the trial court." Aerojet-Gen., 511 F.2d at 719. In the preliminary injunction context, we review findings of fact for clear error. Apple Barrel Prods. v. Beard, 730 F.2d 384, 386 (5th Cir. 1984).

In this case, the district court found that the investors were in privity with Quinn-L. 759 F. Supp. at 1232. The court concluded that the "Investor Plaintiffs bought Lovell's cooperation with their April 5, 1989 Agreement and through their collusion with Lovell obtained an enormous default judgment against Lovell's companies." Id. at 1226. The court further found that "settlement negotiations between the investors' counsel and Lovell started as early as June, 1988 and result in a letter agreement by October 11, 1988." Id. at 1224 n.10. Thus, Lovell and the investors came to a cooperation agreement long before anything of substance was adjudicated in the first declaratory judgment action.

The appellants stress that in the October 1988-April 1989 assignment, Lovell gave the investors only the right to sue in Lovell's name for the damages Royal had caused him personally and that only later (September 4, 1990) did Quinn-L assign its rights to the investors to pursue Royal. But simply because the formal legal relationship between Quinn-L and the investors did not arise until September 4, 1990, does not mean that there was no privity between them before that time.

The district court found that Lovell had sole authority to act for Quinn-L, 759 F. Supp. at 1219 n.1,[14] that Lovell was "bought off" by the settlement agreement, id. at 1226, that the "sole purpose" of that agreement was to pursue Royal,[15] id. at 1224, and that from that point on the investors and Quinn-L (through Lovell) pursued a course of conduct to obtain a hefty payment from Royal in which they would all share, id. at 1226 & n.13. The district court did not clearly err in concluding that the investors were virtually represented by Quinn-L in the first declaratory judgment action. We therefore determine that the investors can be bound by the first declaratory judgment action.

B.

In their Cameron County suit, the investors also seek to recover damages from Royal based upon Royal's post-declaratory judgment conduct. As Quinn-L's assignees, the investors allege, inter alia, that Royal (1) "wrongfully refused" an unqualified defense of the Dallas County litigation; (2) "negligently failed" to settle the Dallas County litigation; (3) waived its right to challenge coverage and is estopped from denying coverage because of its representations to Quinn-L; (4) was negligent in its handling

_____

[14] In January 1989, the bankruptcy court returned Quinn-L's valueless stock to Lovell. Since Lovell filed for personal bankruptcy in 1987, Quinn-L has had no officers, directors, or significant assets. Thus, since January 1989 Lovell has had sole authority to act for Quinn-L. See Royal, 759 F. Supp. at 1219 n.1.

[15] In a letter written to Lovell's counsel, the investors' attorney noted that "the whole point of the [April 5] Compromise and Settlement Agreement was for Plaintiffs to be able to pursue Royal Insurance Company."

23

of the Dallas County litigation; and (5) breached its "duty of good faith and fair dealing."

These claims were brought before the federal district court on August 15, 1990, when Quinn-L answered Royal's declaratory judgment petition of March 9, 1990. They were presented to the Cameron County court on September 4, 1990, when the investors filed suit therein. The district court enjoined these post-declaratory judgment claims under the "in aid of jurisdiction" exception to the Anti-Injunction Act.[16]

1.

The "in aid of jurisdiction" exception is designed to "prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." Atlantic Coast Line R.R. v. Brotherhood of Locomotive Eng'rs, 398 U.S. 281, 295 (1970). The district court noted that "[t]his is precisely such a case; absent injunctive relief the Court will likely lose the ability to decide this case (filed well before either [Cameron County] Action) and may well have its prior Judgments (which are inextricably intertwined with the present action) nullified by contrary state court decrees." 759 F. Supp. at 1235.

The "in aid of jurisdiction" exception, however, does not

---

[16] Royal has conceded that the injunction of these claims cannot be justified under the relitigation exception.

reach this far. In Texas v. United States, 837 F.2d 184, 186 n.4 (5th Cir.), cert. denied, 488 U.S. 821 (1988), we noted the following:

> In cases decided under [the "in aid of jurisdiction"] exception, courts have interpreted the language narrowly, finding a threat to the court's jurisdiction only where a state proceeding threatens to dispose of property that forms the basis for federal in rem jurisdiction, or where the state proceeding threatens the continuing superintendence by a federal court, such as in a school desegregation case. In no event may the "aid of jurisdiction" exception be invoked merely because of the prospect that a concurrent state proceeding might result in a judgment inconsistent with the federal court's decision. [Emphasis added.] [Citations omitted.]

See also Phillips v. Chas. Schreiner Bank, 894 F.2d 127, 132 (5th Cir. 1990) (exception only applies to in rem actions, citing Texas v. United States). The post-declaratory judgment claims at issue in this case do not fit in either category described in Texas v. United States. They obviously do not involve the district court's in rem jurisdiction, nor do they implicate any "superintendence" jurisdiction on the district court's part.

Royal correctly points out that the contours of the categories described in Texas v. United States are not well-defined. The district court relied upon an Eleventh Circuit holding that "lengthy, complicated litigation is the `virtual equivalent of a res,'" Battle v. Liberty Nat'l Life Ins. Co., 877 F.2d 877, 882 (11th Cir. 1989) (citation omitted), and indeed our opinion in Texas v. United States does not specifically preclude such

25

interpretation.[17] But even if we were to broaden the "in aid of jurisdiction" exception to include "lengthy, complicated litigation" that is the "equivalent of a res," we would not put the present action in that category.

The Cameron County court posed no threat to the district court's continuing jurisdiction to decide the post-declaratory judgment claims, other than the fact that there was a possibility that it could reach judgment first. This is not sufficient to invoke the "in aid of jurisdiction" exception. Texas v. United

[17] The district court also relied heavily upon our decision in In re Corrugated Container Antitrust Litig., 659 F.2d 1332 (5th Cir. Unit A Oct. 1981), cert. denied, 456 U.S. 936 (1982), which involved a massive antitrust class action against manufacturers of corrugated containers that was consolidated by the Judicial Panel on Multidistrict Litigation and transferred to the Southern District of Texas. The multidistrict court approved of "settlements executed between the class plaintiffs and most of the defendants." Id. at 1335.

Some of the class plaintiffs, apparently unhappy with the settlements, went to state court with their claims. A panel of this court held that the injunction of the state action was proper because the multidistrict court's approval of the settlements would "bar the South Carolina litigation" on principles of res judicata. Id. Thus, the panel based its decision upon the relitigation exception, and to that extent the case does not support the district court's injunction of the tort, waiver, and estoppel claims.

The Corrugated Container case does contain some jurisdictional language, but it must be construed in light of the factual circumstances of the case. When the plaintiffs filed in state court, they asked for and immediately obtained an injunction prohibiting the defendants (many of whom were defendants in the multidistrict litigation) from "preparing, disseminating or utilizing any settlement document . . . wherein such settlement document contains any release of any antitrust claims" under state law. Id. at 1335. The panel noted that this limitation "would clearly interfere with the multidistrict court's ability to dispose of the broader action pending before it." Id. The court also noted that the multidistrict court's injunction of the state suit would not flout "the policies of federalism" because the plaintiffs' attorneys "ha[d] taken, and manifested an intention to continue to take, actions threatening this court's exercise of its proper jurisdiction and the effectuation of its judgments, by filing and threatening to file duplicative and harassing litigation in the courts of various states and by seeking therein orders disrupting the proceedings" in the multidistrict litigation. Id. (quoting the multidistrict court).

This interference, however, was based upon the attorneys' (and, presumably, the state court's) apparent disregard of the prior federal settlement judgment SQ again, a consideration more appropriate for the relitigation exception. Thus, we disagree with the district court when it states that "[t]he same considerations [as those posed in Corrugated Container] apply to the present action . . . ." 759 F. Supp. at 1236.

26

<u>States</u>, 837 F.2d at 186 n.4 (citing <u>Atlantic Coast Line</u>).[18] It is true that, as Royal argues, the district court invested a great deal of time in resolving the first declaratory judgment action and in enforcing the first declaratory judgment in the second declaratory judgment action. But that investment is adequately protected by the relitigation exception, which avoids "costly and judicially wasteful" duplicative proceedings. <u>Quintero</u>, 914 F.2d at 721.

The district court's investment of time and energy in resolving the coverage issue would be protected by an injunction barring relitigation of that issue SQ not by barring <u>any claim</u> dependent upon that issue. We therefore conclude that the district court should have limited the scope of its injunction to enjoining relitigation of the coverage issue and that its injunction of the post-declaratory judgment claims was improper.

2.

Royal offers a slightly different justification for enjoining the post-declaratory judgment claims. It contends that the district court "was entitled to conclude that the [Cameron County] litigation should be temporarily enjoined until the district court had an opportunity to sort through the complex web of claims raised against enforcement of its prior judgment." In essence, Royal

---

[18] The nature of the "threat" is shown most vividly by the fact that the district court entered an order disposing of these claims on December 20, 1991. The district court's resolution of these claims is discussed <u>infra</u> part IV.

27

argues that, given that this is a preliminary injunction, the district court should be given greater leeway with regard to the injunction's scope, especially considering what the district court found to be collusive behavior on the appellants' part.

Although we are sympathetic, we cannot allow the exceptions to be stretched beyond their justifications. As the Court noted in <u>Chick Kam Choo</u>, "the exceptions are narrow and are `not [to] be enlarged by loose statutory construction.'" 486 U.S. at 146 (citation omitted). Moreover, the district court plainly recognized that there were two types of claims at issue SQ those wholly dependent upon the prior declaratory judgment (the direct claims as judgment creditors) and those "inextricably intertwined" with the issues settled by the declaratory judgment (the post-declaratory judgment claims).

The district court therefore did not enjoin the post-declaratory judgment claims in order to "sort things out"; rather, it did what it said it was doing SQ enjoining the Cameron County action because the state court "could irreparably injure the Court's ability to decide the present case." <u>Royal</u>, 759 F. Supp. at 1235. As noted above, however, the only irreparable injury that the state court posed was deciding the claims. This sort of "interference" is not sufficient to overcome the obstacle of the Anti-Injunction Act.

IV.

Finally, we consider the various motions, pending in this

28

court, to prevent the district court from considering aspects of the case not directly at issue in this appeal. Prior to oral argument, the appellants asked us to stay the district court proceedings pending appeal. Essentially, this would have prevented the district court from considering the merits of the appellants' tort, waiver, and estoppel claims brought as affirmative defenses to Royal's request for declaratory judgment. We denied the motion without opinion on September 6, 1991.

After oral argument, on October 29, the appellants submitted a motion to reconsider the motion for stay of the district court proceedings. On December 20, while the motion for reconsideration was pending, the district court disposed of, <u>inter alia</u>, the post-declaratory judgment claims adversely to the appellants. By a December 24 letter, the appellants asked us to "vacate all orders entered by the court below during the pendency of the improperly issued preliminary injunction, including the December 20, 1991 summary judgment order" covering the post-declaratory judgment claims. Thus, the motion for reconsideration is partially mooted[19] by the orders of the district court, and we now consider the appellants' request to vacate the orders entered while this appeal was pending.

We decline to vacate these orders. As noted above, the appellants' tort, waiver, and estoppel claims were before both the federal district court and the Cameron County court. There was

---

[19] The district court did not rule on Royal's request for a permanent injunction, deferring that issue pending the outcome of this appeal.

always the possibility that the federal court would win the race to judgment; in fact, the odds were heavily in the federal court's favor. It had dealt with the litigation among these parties for over three years by the time the tort, waiver, and estoppel claims were placed before it on August 15, 1990; therefore, it was familiar with the facts and legal disputes. By contrast, the Cameron County court's first exposure to the case was September 4, 1990, when the appellants filed their suit.

At most, what the district did by enjoining these claims was to ensure it would win the race. We are well aware of the general rule that parallel state and federal actions should be allowed to proceed without interference from either court. Atlantic Coast Line, 398 U.S. at 295-96. Vacating the orders of the district court, however, would do nothing to put the state and federal courts back on an even footing. Indeed, the district court would be free to re-enter its orders the moment after they were vacated. Thus, even if vacating orders would be appropriate in some cases, it would merely be an academic exercise in this case.

Finally, we note that the equities do not weigh in the appellants' favor. They created this tangled web of litigation by seeking to evade the effect of the first declaratory judgment action: Having encountered a roadblock in federal court, they brought their claims to state court, collusively obtained an inflated default judgment there, and sought to collect that judgment (and more) in another state court. That their "victory" on the "in aid of jurisdiction" question is a somewhat hollow one

30

does not persuade us to vacate the district court's orders.  The appellants presumably may appeal the district court's disposition of their tort, waiver, and estoppel claims.

## V.

In conclusion, we find that the district court had ancillary jurisdiction over this matter.  In addition, we find that the portion of the injunction based upon the relitigation exception SQ the injunction of the appellants' direct claims as judgment creditors under the insurance contract SQ was proper.  We further find that the portion of the injunction based upon the "in aid of jurisdiction" exception SQ the injunction of the appellants' tort, waiver, and estoppel claims brought as assignees SQ was improper. We therefore AFFIRM in part, REVERSE in part, and REMAND.  Finally, we DENY the appellants' request to vacate the district court's orders entered during the pendency of this appeal.