Revised July 9, 1999

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-40682
_____


NEXT LEVEL COMMUNICATIONS LP; KK MANAGER LLC; GENERAL INSTRUMENT
CORPORATION, formerly known as Next Level Systems Incorporated;
SPENCER TRASK & COMPANY INCORPORATED,

                              Plaintiffs-Appellees,

        v.

DSC COMMUNICATIONS CORPORATION; DSC TECHNOLOGIES CORPORATION,

                              Defendants-Appellants.

_____

              Appeal from the United States District Court
                   for the Eastern District of Texas
_____
                          June 21, 1999
Before KING, Chief Judge, and REYNALDO G. GARZA and JOLLY,
Circuit Judges.

KING, Chief Judge:

        Defendants-appellants DSC Communications Corporation and DSC

Technologies Corporation appeal from a May 14, 1998 order of the

district court issuing a preliminary injunction that prevents

them from pursuing an action filed in Delaware state court on

March 5, 1998.  Because we conclude that the district court's

preliminary injunction is proper under the relitigation exception

to the Anti-Injunction Act, 28 U.S.C. § 2283, we affirm.

            I.   FACTUAL AND PROCEDURAL HISTORY

Defendants-appellants DSC Communications Corporation and DSC Technologies Corporation (collectively, DSC) design and manufacture telecommunications equipment, including a broadband access product referred to as Switched Digital Video (SDV). Two of its former employees, Thomas Eames and Peter Keeler, were responsible for designing and marketing the SDV technology for DSC. In 1994, while still employed by DSC, Eames and Keeler created a company, Next Level Communications Corporation (Next Level I), to develop an SDV product to compete with DSC. In July 1994, they resigned from DSC, taking six DSC employees with them. In 1995, General Instrument Corporation (General Instrument I) acquired Next Level I.

In April 1995, DSC filed suit against Next Level I, Eames, and Keeler in Texas state court. The defendants removed the action to the United States District Court for the Eastern District of Texas (the First Federal Action). See DSC Communications Corp. v. Next Level Communications, No. 4:95cv96 (E.D. Tex. filed Apr. 1995). In March 1996, a three-week jury trial ensued.

The jury ultimately found that Eames and Keeler had breached their contractual obligations to DSC; that, as fiduciaries of DSC, they had diverted a corporate opportunity for the benefit of themselves and Next Level I; and that Eames, Keeler, and Next Level I had misappropriated DSC's trade secrets. DSC claimed

2

damages based on its future lost profits.[1]  The jury awarded

actual and punitive damages of $369,200,000.

Thereafter, in April 1996, DSC moved for entry of judgment

for all actual and punitive damages awarded by the jury and

requested a permanent injunction prohibiting Next Level I, Eames,

and Keeler from further disclosing or transferring the stolen DSC

trade secrets.  Finding that the legal theories upon which the

jury had awarded damages overlapped, the district court ordered

DSC to choose between the damages for breach of contract,

diversion of corporate opportunity, and misappropriation of trade

secrets.  DSC elected the actual and punitive damages associated

with the diversion of corporate opportunity finding.  In a June

11, 1996 order, the district court denied DSC's request for a

permanent injunction, reasoning that DSC had already been

compensated for the future harm DSC sought to enjoin.

Accordingly, on June 11, 1996, the district court entered

judgment for DSC in the amount of $136,732,000.[2]

---

[1]  DSC's expert had calculated DSC's future lost profits by
assuming that Next Level I would get to market first with its SDV
system and then "computing DSC's expected market share and
profits that they would have achieved in the absence of
Defendants' wrongful conduct and subtracting DSC's expected
market share and profits after Defendants' wrongful conduct."

[2]  The June 11, 1996 judgment contained a temporary
injunction to prevent Eames, Keeler, and Next Level I from
disclosing or transferring DSC's trade secrets except in the
ordinary course of business until they satisfied the judgment.
Because the district court had denied DSC's request for a
permanent injunction in its June 11, 1996 order, the June 11,
1996 judgment did not contain a permanent injunction, nor any

3

Dissatisfied with the district court's failure to include a permanent injunction as part of the judgment, DSC filed an expedited motion on June 13, 1996, seeking to modify the judgment to include a limited permanent injunction. The district court denied this motion the same day, again reasoning that an injunction would provide DSC with a duplicate recovery.

On July 3, 1996, DSC filed an "Emergency Motion for Injunction Pending Appeal," seeking an injunction to prohibit Next Level I from using, transferring, or disclosing DSC's trade secrets during the appeal. On July 9, 1996, the district court denied DSC's emergency motion, reasoning that DSC's claim that it was entitled to an injunction in addition to the monetary damages already awarded had a low probability of success on appeal.

On July 15, 1996, DSC filed a motion for injunction pending appeal in this court, seeking an order enjoining Next Level I from using, transferring, or disclosing the trade secrets it had wrongfully obtained. On July 24, 1996, we denied DSC's motion for an injunction pending appeal, but expedited the appeal sua sponte.

On appeal, DSC asked this court to affirm the judgment for usurpation of corporate opportunity, requested an additional $101 million in damages for trade secret misappropriation, and requested an injunction prohibiting the transfer or disclosure of

reference to one.

4

DSC's trade secrets. On February 28, 1997, we ruled that the district court had not relied on clearly erroneous factual findings or erroneous conclusions of law in denying DSC's injunction request and thus had not abused its discretion in refusing to grant a permanent injunction. See DSC Communications Corp. v. Next Level Communications, 107 F.3d 322, 328 (5th Cir. 1997). We also determined that the award for usurpation of corporate opportunity could not stand, and remanded the case for entry of judgment on the claim for misappropriation of trade secrets. See id. at 326, 331.

In July 1997, before the district court had entered final judgment after the appeal, General Instrument I, the parent corporation of Next Level I, divided its business into three separate publicly-held corporations. Next Level I was acquired by one of these three corporations, Next Level Systems, Inc. (Systems). On July 15, 1997, DSC filed a "Motion for Show Cause Order" in the district court, arguing that the transaction violated the limited temporary injunction, contained in the district court's June 11, 1996 final judgment, that prohibited a disclosure or transfer of DSC's trade secrets, other than in the ordinary course of business, until the judgment was satisfied. Next Level I filed a response, arguing that the trade secrets were still owned by the same corporate entity, Next Level I, and that the only difference was that Next Level I had become a subsidiary of a different company, Systems. The district court

5

concluded, in an order dated July 22, 1997, that the spin-off transaction did not violate the injunction.

On October 28, 1997, the district court entered a new final judgment in the total amount of $137,732,000 for the actual and punitive damages associated with the jury finding of misappropriation of trade secrets. The October 28, 1997 final judgment, like the June 11, 1996 final judgment, contained an interim injunction that was to remain in effect until the judgment had been fully satisfied. Next Level I satisfied the judgment on November 6, 1997 by paying $140,691,717.81. A satisfaction of the judgment was filed with the court on November 7, 1997, and the interim injunction was dissolved.

In January 1998, Systems decided to spin off the entire business of its wholly-owned subsidiary, Next Level I. Systems transferred the business as a whole, including its technology, management, and workforce, to Next Level Communications, L.P. (Next Level II), one of four plaintiffs-appellees in this action, in exchange for an eighty-nine percent limited partnership interest in Next Level II. Another plaintiff-appellee, Spencer Trask & Co. (Trask), created plaintiff-appellee KK Manager L.L.C. (KK Manager). KK Manager acquired the other eleven percent ownership interest in Next Level II in exchange for an investment of $10,000,000, and became operating general partner of Next Level II. Systems then changed its name back to General

Instrument (General Instrument II). General Instrument II is the final plaintiff-appellee in this action.

On March 5, 1998, DSC filed a complaint in the Superior Court of the State of Delaware naming as defendants Next Level II, KK Manager, General Instrument II, and Trask,[3] and asserting claims based on misappropriation of trade secrets (the Delaware Action). Specifically, DSC alleged that General Instrument II (formerly Systems) improperly disclosed trade secrets when it conveyed the SDV technology from Next Level I to Next Level II, that Next Level II and KK Manager misappropriated DSC's trade secrets, and that Trask conspired to misappropriate DSC's trade secrets. As to Next Level II and KK Manager, DSC requested an award of unjust enrichment damages. As to General Instrument II, DSC sought the imposition of a constructive trust and an order requiring the disgorgement to DSC of the consideration General Instrument II received for its alleged improper transfer of DSC's trade secrets to Next Level II and KK Manager. Finally, through its civil conspiracy claim, DSC sought to make Trask jointly and severally liable for any unjust enrichment and disgorgement damages owed by the other defendants.

On April 2, 1998, the Delaware defendants returned as plaintiffs to the district court below, the same court that had presided over the First Federal Action, to request a preliminary

[3] These four entities, plaintiffs-appellees in this suit, will be referred to as the Delaware defendants or as plaintiffs.

7

and permanent injunction to prevent DSC from prosecuting the Delaware Action. Jurisdiction was premised on the All Writs Act, 28 U.S.C. § 1651(a), and the relitigation exception to the Anti-Injunction Act, 28 U.S.C. § 2283.

On May 8, 1998, the district court conducted a hearing on the application for a preliminary injunction. The court signed an order granting the preliminary injunction on May 14, 1998. In its order, the district court concluded that the "Delaware Lawsuit is based on an alleged transfer of DSC's trade secrets that falls within the categories of potential future acts for which DSC has already received full compensation in the Federal Lawsuit," that under the district court's rulings in the First Federal Action, DSC would not be entitled to recover additional damages stemming from the transfer alleged in the Delaware Action, and that a preliminary injunction barring prosecution of the Delaware Action was therefore appropriate. The district court reached this conclusion based on its "particular knowledge and familiarity with the complex damages theory on which DSC recovered its future lost profit damages and with the arguments asserted by DSC in its effort to obtain additional permanent injunctive relief from future transfers or disclosures." DSC filed its timely notice of appeal on June 1, 1998 and this appeal followed.

## II. STANDARD OF REVIEW

Although generally the grant of a preliminary injunction is reviewed for abuse of discretion, our review is de novo because the application of the relitigation exception is an issue of law. See Texas Commerce Bank Nat'l Assoc. v. State of Florida, 138 F.3d 179, 181 (5th Cir. 1998) (applying de novo review to legal conclusions underlying denial of preliminary injunction under relitigation exception); accord Transouth Fin. Corp. v. Bell, 149 F.3d 1292, 1294 (11th Cir. 1998); Prudential Ins. Co. v. Doe, 140 F.3d 785, 788 (8th Cir. 1998); Quackenbush v. Allstate Ins. Co., 121 F.3d 1372, 1377 (9th Cir. 1997). If the district court is incorrect in its legal conclusion that the relitigation exception applies, it is barred by the Anti-Injunction Act from issuing an injunction. See 28 U.S.C. § 2283; Atlantic Coast Line R.R. v. Brotherhood of Locomotive Eng'rs, 398 U.S. 281, 286 (1970) (stating that Anti-Injunction Act is absolute bar to issuance of injunction unless one of three exceptions applies).

## III. DISCUSSION

The Anti-Injunction Act prohibits a federal court from granting an injunction to stay proceedings in a state court "except as expressly authorized by an Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. These exceptions are narrowly construed. See Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 146 (1988); Atlantic Coast Line, 398 U.S. at 287.

9

The exception allowing an injunction to "protect or effectuate" a federal court judgment is commonly referred to as the relitigation exception. It "was designed to permit a federal court to prevent state litigation of an issue that previously was presented to and decided by the federal court" and "is founded in the well-recognized concepts of res judicata and collateral estoppel." Choo, 486 U.S. at 147. "[A]n essential prerequisite for applying the relitigation exception is that the claims or issues which the federal injunction insulates from litigation in state proceedings actually have been decided by the federal court." Id. at 148. In order to decide whether the relitigation exception applies in this case, this court must assess the "precise state of the record" in the First Federal Action to determine what was actually decided. Id.

> [A] complainant must make a strong and unequivocal showing of relitigation of the same issue to avoid the bar of section 2283, and [i]f we err, all is not lost. A state court is as well qualified as a federal court to protect a litigant by the doctrines of res judicata and collateral estoppel.

Texas Employers' Ins. Ass'n v. Jackson, 862 F.2d 491, 501 n.13 (5th Cir. 1988) (en banc) (internal quotation marks omitted).

Both parties agree that res judicata is inapplicable to the case before us. Thus, only if collateral estoppel principles apply is the district court's injunction barring the Delaware Action proper under the relitigation exception. Although Texas state law governed the First Federal Action, "federal law

determines the judgment's preclusive effect." Recoveredge L.P. v. Pentecost, 44 F.3d 1284, 1290 & n.11 (5th Cir. 1995).

Collateral estoppel "'is limited to matters distinctly put in issue, litigated, and determined in the former action.'" Brister v. A.W.I., Inc., 946 F.2d 350, 354 (5th Cir. 1991) (quoting Diplomat Elec., Inc. v. Westinghouse Elec. Supply Co., 430 F.2d 38, 45 (5th Cir. 1970)). This court has determined that collateral estoppel encompasses three elements: "(1) the issue at stake must be identical to the one involved in the prior action; (2) the issue must have been actually litigated in the prior action; and (3) the determination of the issue in the prior action must have been a necessary part of the judgment in that earlier action." Recoveredge, 44 F.3d at 1290; see Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.), 163 F.3d 925, 932 (5th Cir. 1999), petition for cert. filed, 67 U.S.L.W. 3643 (U.S. Apr. 12, 1999); Meza v. General Battery Corp., 908 F.2d 1262, 1273 (5th Cir. 1990). Moreover, the legal standard used to assess the issue must be the same in both proceedings. See Recoveredge, 44 F.3d at 1291. However, the actual claims and the subject matter of each suit may differ. See id. Finally, "[u]nlike claim preclusion, the doctrine of issue preclusion may not always require complete identity of the parties." Meza, 908 F.2d at 1273.

Thus, the relevant questions for our determination are what the district court in the First Federal Action actually decided,

11

whether that issue is identical to the relevant issue in the Delaware Action, and whether the issue formed a necessary part of the judgment in the First Federal Action.[4]

Plaintiffs argue that the district court in the First Federal Action denied DSC a permanent injunction that would have prevented the future transfer or disclosure of DSC's trade secrets on the ground that the future lost profits damages awarded in the final judgment were adequate compensation for any such future transfer or disclosure.  Plaintiffs contend that in the Delaware Action DSC is seeking to relitigate whether it is entitled to additional damages beyond those already recovered in the First Federal Action.  Because the district court in the First Federal Action decided that the damages awarded in that suit compensated DSC fully, including for any harm stemming from future transfers to third parties, according to plaintiffs collateral estoppel bars the Delaware Action.  After a careful review of the record, we agree with plaintiffs.

A.  **The Issue in the First Federal Action**

In its April 1996 post-verdict "Motion for Judgment," DSC argued that an injunction was necessary to prevent the disclosure or transfer of DSC's trade secrets "to any third party" because

---

[4]  Neither side raises an argument with respect to the second element of collateral estoppel—namely, whether the issue was "actually litigated" in the earlier action.  Recoveredge, 44 F.3d at 1290.  The fulfillment of this requirement obviously depends on how the issue is defined.  As we demonstrate below, this element is not at issue in this lawsuit.

12

Next Level I "may attempt to cause the DSC Trade Secrets to pass into the public domain by wrongfully disclosing them to third parties, including without limitation . . . [Next Level I's] parent company, General Instrument Corporation ("GI"), or any other entity owned in whole or in part by GI." This is exactly what transpired in January 1998 when the business of Next Level I was transferred to Next Level II.

In its April 19, 1996 reply brief, DSC further explained its request for a permanent injunction as follows:

> DSC suffered severe damages as a result of Defendants' deliberate illegal conduct for which DSC should be awarded monetary damages. These monetary damages were awarded to compensate DSC for only one type of damage—future lost profits. Unless this Court enjoins Defendants as requested in DSC's Motion for Judgment, DSC will suffer further damage for which the damage award does not compensate DSC and for which the harm to DSC will be irreparable.
>
> DSC's damages for Defendants' misappropriation partially compensate DSC for the unfair advantage that Defendants have received by using DSC's trade secrets. Because of this unfair advantage, [Next Level I] will get its product to market faster than it otherwise would have, allowing [Next Level I] to capture a greater market share than it otherwise would have and will cause DSC to suffer future lost profits. DSC may suffer further harm, however, unless this Court enjoins Defendants as requested by DSC.
>
> . . . .
>
> [T]here are two main purposes of an injunction: (1) preventing unjust enrichment of the defendant and (2) preventing further harm to the plaintiff.
>
> . . . .
>
> The damages awarded by the jury compensate DSC for the profits that DSC will lose as a result of [Next Level I's] use of DSC's trade secrets. Those damages in no way compensate DSC for the harm that would result if Defendants

13

caused DSC's trade secrets to enter into the public domain so that <u>any</u> of DSC's competitors were free to use them.  If Defendants are not enjoined as DSC requests,[5] they could potentially destroy all value of DSC's trade secrets through public disclosure and thereby allow more of DSC's competitors to benefit from DSC's technology.

DSC requests an injunction preventing disclosure to avoid such irreparable harm.  The requested relief comports with the second purpose of trade secret injunctions: preventing further harm to DSC.  The requested relief would prevent [Next Level I] from destroying the value of DSC's trade secrets through disclosure to others.

As the above excerpts demonstrate, DSC premised its request for injunctive relief on DSC's belief that the damages already awarded did not fully compensate it for the future harm that would result from a transfer of the trade secrets.  The district court nevertheless denied DSC's request for a permanent injunction to prevent the future disclosure or transfer of the stolen trade secrets.  In its June 11, 1996 order, the district court reasoned that DSC had already been "made whole" by the damages award and stated that:

Since the jury has found, and the Court has upheld the findings, that DSC has suffered future lost profits, DSC is not entitled to an injunction against the Defendants. . . . DSC premised a large portion of its damages claims on Next Level developing a FTTC/SDV system which competes with DSC's SDV system.  DSC has successfully recovered monetary damages for that future injury and has been "made whole" for those

_____

[5]  The injunction DSC requested in its "Motion for Judgment" consisted of "a permanent injunction preventing Eames, Keeler, or [Next Level I] from disclosing or transferring to any third party the six trade secrets identified at trial" and "an assignment to DSC . . . of all patent applications."  Thus, the district court was clearly aware that the relief DSC was seeking included an injunction to prevent the future transfer or disclosure of DSC's trade secrets.

14

damages. An injunction which prevents Next Level from performing any act for which DSC has already been compensated would afford DSC a duplicative remedy.

The district court's conclusion must be read in light of the arguments presented to it by the parties. See Atlantic Coast Line, 398 U.S. at 292 (concluding that proper interpretation of ambiguous passage can be reached "only when it is considered in light of the arguments presented to the District Court"). Because DSC requested an injunction to prevent the future transfer or disclosure of its trade secrets and because the request was premised on the inadequacy of the damages award to compensate DSC for future transfers or disclosures, the district court's conclusion that an injunction would be a duplicative remedy and that DSC had been "made whole" by the damages award can only refer to this request. Thus, it is clear that the district court decided that the judgment already compensated DSC for future transfers to third parties.

This conclusion is confirmed by DSC's later filings. In DSC's expedited motion of June 13, 1996, DSC warned the district court that without a permanent injunction Next Level I "will be permitted to pay the Judgment and then disclose DSC's trade secrets to third parties and thereby inflict further damage upon DSC for which it is not compensated by the Judgment." DSC further argued that without an injunction

> Defendants are free to pay the Judgment and then disclose all of DSC's trade secrets to third parties. Such disclosure would effectively destroy the value of DSC's trade secrets

15

and might allow other competitors to use them in their products.

. . . .

Modifying the Judgment to include this limited permanent injunction would not be duplicative of any other relief the Judgment affords DSC or any other relief DSC sought in this action. Neither the damages awarded to DSC by the jury for the Defendants' misappropriation of DSC's trade secrets nor the damages awarded to DSC by the jury and by the Court for usurpation of corporate opportunity compensate DSC for the harm DSC will suffer if its trade secrets are disclosed to third parties by the Defendants.

To avoid such irreparable harm, DSC requests a limited permanent injunction against disclosing or transferring DSC's trade secrets. The requested relief would prevent Defendants from destroying the value of DSC's trade secrets through disclosure to others and would impose no hardship on Defendants.

After considering these arguments, the district court again refused to grant DSC's request for an injunction. According to the district court's June 13, 1996 order, "DSC contends that '[Next Level I] should not be allowed to destroy the value of DSC's trade secrets after paying the Judgment.' These claims were resolved when the Court ruled upon DSC's Motion for Judgment." This indicates that the district court believed that it previously had considered DSC's claim that a transfer to third parties would destroy the value of DSC's trade secrets when, in ruling on DSC's "Motion for Judgment," it denied DSC injunctive relief on the ground that the judgment already compensated DSC for that harm. The district court further stated in its June 13, 1996 order:

16

DSC obtained monetary damages for the <u>future</u> damages arising from Defendants' malicious usurpation of DSC's corporate opportunity. As DSC's own expert testified, these damages were predicated upon Defendants possessing and actively implementing DSC's trade secrets. Having recovered monetary damages for Defendants' future possession and use of these trade secrets, DSC now attempts to prevent Defendants from performing the very acts for which DSC has been "made whole." The Court's judgment in this case does not "vest[] ownership of DSC's trade secrets in [Next Level I]," . . . and does not approve of the manner in which the trade secrets were acquired and are being used. The Court will not, however, award DSC a duplicate recovery when DSC has recovered the damages awarded by the judgment.

Because this statement responds to DSC's only request in its June 13, 1996 expedited motion—the request for a "limited permanent injunction against disclosing or transferring DSC's trade secrets"—it is clear that the district court decided that Next Level I's "future possession and use" of DSC's trade secrets, for which the district court found that the judgment fully compensated DSC, permitted transfers to third parties.

DSC next filed its July 3, 1996 "Emergency Motion for Injunction Pending Appeal," requesting an injunction for the duration of the appellate process. In this motion, DSC recognized that the district court previously had found that the judgment allowed Next Level I to use DSC's trade secrets, stating that "the Court has concluded (incorrectly in DSC's view) that the judgment gives DSC damages for 'possession and use of DSC's trade secrets'" (citing the district court's June 13, 1996 order). DSC went on to insist, however, that the damages award did not compensate it for the harm that would result if Next

17

Level I transferred DSC's trade secrets to a third party: "The damages awarded in the judgment, however, are for future lost profits on SDV and Litespan sales, not for damages due to the destruction in the value of DSC's trade secrets if they are disclosed or transferred to a third party."

The district court obviously disagreed with DSC's assessment of the scope of the judgment because, in its July 10, 1996 order, it once again denied DSC's request for an injunction pending appeal, stating that "DSC's claims of DSC's entitlement to an injunction as well as monetary future damages . . . have a low probability of success upon appeal."[6]

_____

[6] In light of DSC's repeated requests for an injunction to prevent the transfer or disclosure of its trade secrets, we reject DSC's argument that the district court denied its requested injunction on the ground that DSC had been made whole only for the future damages associated with Next Level I developing an SDV system that competes with DSC's system, instead of on the ground that DSC had been compensated for any future damages associated with the transfer of SDV technology to third parties. This argument ignores completely the context of the district court's rulings, which arose solely in response to DSC's requests for an injunction to prevent transfer or disclosure of its trade secrets. The district court's finding that DSC had been made whole must be read in light of these requests, and thus DSC is incorrect that the district court "ruled only that DSC had been 'made whole' with respect to [DSC's] claim for lost profits."

We also reject DSC's alternate argument that the district court considered only the potential harm that would result if DSC's trade secrets were disseminated to the public at large, causing them to become completely valueless because many others could then develop competing systems. The record makes clear that the district court considered the harm that would flow from any potential transfer. In any event, if the only potential harm considered by the district court was the harm flowing from a dissemination of the trade secrets to the public at large, and yet the district court still repeatedly held that the judgment

18

DSC pressed its arguments for an injunction further.  In its motion for an injunction pending appeal filed in this court on July 15, 1996, DSC argued that it was entitled to both monetary damages and injunctive relief because monetary damages "in no way compensate DSC for the harm that would result if [Next Level I] caused DSC's trade secrets to enter into the public domain so that any of DSC's other competitors were free to use them" (emphasis omitted).  This court denied DSC's motion for an injunction pending appeal.

In its appellate brief, DSC again argued that it was entitled to a limited permanent injunction in addition to monetary damages to prevent the transfer or disclosure of its trade secrets:

> The trade secret damages would compensate DSC for its lost profits on SDV product sales due to the unfair competitive advantage enjoyed by Next Level because of its ability to use DSC's trade secrets, but in no way would compensate DSC for the harm that would result if Defendants caused DSC's trade secrets to enter into the public domain so that any of DSC's other competitors were free to use them.
>
> . . . .
>
> If Defendants are not enjoined as DSC requests, they could potentially destroy all remaining value of DSC's trade secrets through public disclosure, thereby allowing other competitors to benefit from DSC's technology.

---

fully compensated DSC, then, <u>a fortiori</u>, the district court also held that the judgment compensated DSC for the harm that would flow from the transfer of DSC's trade secrets to just one other party.

(emphasis omitted). DSC alternatively requested an injunction to prevent Next Level I from using DSC's trade secrets at all: "A trade secret use injunction would prevent Next Level from being unjustly enriched by its use of the property it wrongfully took from DSC."

This court rejected DSC's arguments and affirmed the district court's refusal to grant either type of injunction.[7] We concluded that the district court "did not rely on clearly erroneous factual findings or an erroneous conclusion of law." DSC Communications Corp., 107 F.3d at 328. Thus, in denying DSC both forms of injunctive relief, we, by necessity, passed on the question of whether the district court had incorrectly concluded that DSC was entitled to no further relief beyond the judgment and concluded that the district court had not erred.[8]

Based on the foregoing, it is clear that the district court decided that DSC had been made whole by the damages award and that future transfers would not entitle DSC to any relief in addition to what it had already received. Furthermore, this

---

[7] Before this court, DSC had requested "either a limited injunction in combination with monetary damages or a total injunction prohibiting Next Level from using the trade secrets the jury found it misappropriated." DSC Communications Corp., 107 F.3d at 328.

[8] Thus, the requirement found in Hicks v. Quaker Oats Co., 662 F.2d 1158, 1168 (5th Cir. Unit A Dec. 1981), "that if a judgment is appealed, collateral estoppel only works as to those issues specifically passed upon by the appellate court," has been satisfied.

court agreed that the district court had not made clearly erroneous factual findings or erroneous conclusions of law, and therefore affirmed the district court's refusal to grant permanent injunctive relief.  See id.

**B.  The Issue in the Delaware Action**

The issue in the First Federal Action—litigated vigorously by DSC, decided by the district court, and affirmed by this court—is the same as the issue that DSC seeks to litigate in Delaware court, namely, DSC's entitlement to additional relief beyond the damages it recovered in the First Federal Action for any transfer of DSC's trade secrets occurring after the judgment in the First Federal Action.  In its Delaware complaint, DSC contends that it is entitled to recover damages for the transfer of DSC's trade secrets by General Instrument II to Next Level II. The district court concluded, and this court found no error in the conclusion, that the judgment in the First Federal Action fully compensated DSC and that DSC was not entitled to relief beyond that afforded by the judgment for the future transfer of its trade secrets.

**C.  The Issue was Necessary to the Judgment**

The conclusion that DSC was already compensated fully by the judgment and was not entitled to additional relief for future transfers of its trade secrets was a necessary part of the district court's decision to deny DSC's request to include

21

permanent injunctive relief as part of the final judgment. Because the final judgment contained an interim injunction only, it is clear that an integral part of the final judgment was the district court's denial of the request for permanent injunctive relief.[9] In order for the district court to conclude that DSC was not entitled to a permanent injunction to prevent the transfer of DSC's trade secrets to third parties, it was necessary for the district court to decide whether such an injunction would constitute an improper double recovery. The district court's conclusion that DSC was already fully compensated by the judgment for future transfers to third parties was thus necessary to its denial of the permanent injunction and necessary to the judgment. We therefore conclude that all the requirements of collateral estoppel are met and that the Delaware Action is barred.

### D.    DSC's Arguments

---

[9]    We reject DSC's argument that the denial of permanent injunctive relief was not necessary to the district court's final judgment because the final judgment did not mention the denial of permanent injunctive relief. DSC itself has previously recognized that the final judgment did in fact deny it the permanent injunctive relief that it had requested despite the fact that the denial of injunctive relief did not appear in the final judgment. DSC characterized the judgment in its July 3, 1996 "Emergency Motion for Injunction Pending Appeal" as follows: "The judgment awards DSC's damages only for the Defendants' usurpation of a corporate opportunity that belonged to DSC. Although the judgment incorporates the April 10, 1996 [temporary] [i]njunction, it denies both permanent injunctive relief and adequate protection of DSC's trade secrets pending appeal." (Emphasis added).

22

DSC argues strenuously that collateral estoppel does not bar the Delaware Action.  First, DSC argues that the facts are different in each case because, in Delaware, DSC has sued different defendants, three of whom did not exist during the First Federal Action, for a new and different tort that occurred after the First Federal Action concluded.  Specifically, DSC argues that the First Federal Action was premised on Eames, Keeler, and Next Level I's 1994 misappropriation of trade secrets, and included a claim for lost profits damages only, whereas the Delaware action is premised on the misappropriation of trade secrets that occurred after the conclusion of the First Federal Action when General Instrument II transferred DSC's trade secrets to Next Level II in January 1998 and states an entirely different claim for relief, requesting only unjust enrichment and disgorgement damages.

These distinctions, while perhaps meaningful for purposes of res judicata, are irrelevant to the application of collateral estoppel.  It does not matter that the claims in each suit are different, or that the subject matter of each suit is different, so long as the issue litigated in each suit is identical.  See Recoveredge, 44 F.3d at 1291 ("Collateral estoppel will apply in a second proceeding that involves separate claims if the claims involve the same issue . . . and the subject matter of the suits may be different as long as the requirements for collateral estoppel are met."); RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982)

("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, <u>whether on the same or a different claim</u>.") (emphasis added).  Nor is it significant that DSC is suing different defendants in Delaware than it sued in the First Federal Action because there need not be complete identity of parties for collateral estoppel to apply.  See <u>Meza</u>, 908 F.2d at 1273; <u>see also</u> <u>Royal Ins. Co. v. Quinn-L Capital Corp.</u>, 960 F.2d 1286, 1289, 1291, 1297 (5th Cir. 1992) (applying collateral estoppel principles in upholding injunction under relitigation exception even though parties enjoined in second action were not identical to those in first action that was deemed to have preclusive effect).[10]

---

[10]  In contrast to the factual circumstances of <u>Royal Insurance</u>, in the case at bar, the party against whom the district court has issued an injunction barring future prosecution of a state court action, DSC, is in fact a party both to the state court action to be enjoined and to the earlier action, making the application of collateral estoppel less troubling because DSC itself previously litigated the issue. Moreover, despite the fact that the Delaware defendants were not parties to the First Federal Action, DSC itself is seeking to use the district court's judgment in the First Federal Action to collaterally estop the Delaware defendants from challenging the fact that the trade secrets at issue were stolen from DSC.  In DSC's complaint filed in Delaware court, DSC states: "The judgment in the Texas case operates as collateral estoppel (issue preclusion) not just as to the defendants in the Texas case, but also their privies and successors in interest, including the defendants in this action."

24

Second, DSC argues that collateral estoppel is inapplicable because a different legal standard applies in Delaware: The Delaware Action will be governed by Delaware law, which includes the Uniform Trade Secrets Act, whereas Texas law, which does not include the Uniform Trade Secrets Act, governed the First Federal Action. However, that the Uniform Trade Secrets Act applies in Delaware will not change the standard necessary to determine the relevant issue in Delaware—whether DSC is entitled to relief for the January 1998 transfer of its trade secrets in addition to the damages it already recovered in the First Federal Action. Although, as DSC points out, Delaware law allows recovery for both actual loss and unjust enrichment, it only allows recovery for "unjust enrichment . . . that is not taken into account in computing actual loss." DEL. CODE ANN. tit. 6, § 2003. Thus, like Texas law, Delaware law does not allow plaintiffs to recover twice for the same injury. If the Delaware Action is allowed to proceed, the Delaware court would have to decide whether the damages DSC requested there are duplicative of the damages DSC already recovered. This is exactly the legal standard that applied when the district court in the First Federal Action decided that DSC's requested injunctive relief would constitute an improper double recovery. Thus, the legal standard used by the district court in the First Federal Action, in deciding that DSC was not entitled to permanent injunctive relief to prevent the transfer of DSC's trade secrets to third parties, is the same

as the standard the Delaware court would have to use to determine whether DSC is entitled to damages for the January 1998 transfer of DSC's trade secrets—namely, whether the earlier judgment provides a complete recovery or whether the January 1998 transfer would justify additional relief.  This determination will hinge on an examination of the scope of the judgment, an issue already decided conclusively by the district court in the First Federal Action.

DSC next argues that because, in the First Federal Action, the issue was decided in the context of a request for injunctive relief and because this court reviewed the district court's denial of a permanent injunction only for abuse of discretion, the same legal standards will not apply in Delaware, where the trial court will have to make the determination of whether the unjust enrichment damages claimed by DSC are duplicative of the damages awarded in the First Federal Action without reference to the standards governing equitable relief or to an abuse of discretion standard.  While it is true, as DSC states, that "[o]ne might . . . easily fail to obtain an injunction and yet be entitled later to recover damages at law," <u>Kelliher v. Stone & Webster, Inc.</u>, 75 F.2d 331, 333 (5th Cir. 1935), it was not the particular standard of review that prevented DSC from obtaining its injunction, either here or in the district court, but the district court's conclusion, which we agreed was not in error, that the judgment already compensated DSC for the harm it sought

to enjoin. Although the district court decided the issue in the First Federal Action in the context of a request for a permanent injunction, the district court ultimately did not decide that DSC was not entitled to an injunction because injunctions are drastic remedies or because there were adequate legal remedies that DSC could seek elsewhere. Instead, as outlined above, the district court denied the injunction specifically because DSC had already obtained compensation for the harm DSC sought to enjoin. This court, in affirming the district court's denial of injunctive relief, concluded that the district court had not made clearly erroneous factual findings or erroneous conclusions of law. The issue to be decided in Delaware will be the same, and thus it is irrelevant that the issue was decided in the First Federal Action in the context of a request for injunctive relief or that we reviewed the district court's conclusions for abuse of discretion.

Finally, to bolster its argument that collateral estoppel does not bar the Delaware Action, DSC points to several cases in which courts denied injunctive relief in one suit, but later allowed a second suit for monetary damages when the conduct that the plaintiffs sought to enjoin in the first suit actually transpired. See Lawlor v. National Screen Serv. Corp., 349 U.S. 322 (1955); Kelliher v. Stone & Webster, Inc., 75 F.2d 331 (5th Cir. 1935); June v. George C. Peterson Co., 155 F.2d 963 (7th Cir. 1946). These cases are all distinguishable because not one

27

involves a court's denial of an injunction on the ground that the movant had already been compensated for the conduct the movant sought to enjoin. These cases stand for the unremarkable proposition that the failure to get an injunction in one suit does not prevent an action for damages when the conduct initially sought to be prevented happens. None of the cases involves a denial of an injunction on the ground that the damages awarded already compensated the movant for the future harm that later transpired.

**E. Summary**

DSC pressed the district court in the First Federal Action to decide DSC's entitlement to relief for the future transfer of its trade secrets. We need not (and do not) here decide whether the many judges who addressed that issue in the First Federal Action reached the correct result. It is enough to say that the issue was conclusively determined in that action. We conclude that DSC is collaterally estopped from arguing in Delaware court that the January 1998 transfer of DSC's trade secrets from Next Level I to Next Level II caused it additional injuries for which it is entitled to seek monetary compensation. Because it is clear that collateral estoppel bars the relitigation of this issue, it would be unjust to allow the Delaware Action to proceed, which would force the parties to bear the costs of litigation in Delaware. Thus, we hold that the relitigation

28

exception to the Anti-Injunction Act applies, and therefore affirm the district court's preliminary injunction.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of the requested preliminary injunction.