REVISED, OCTOBER 3, 2000

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-30501
_____

REGIONS BANK OF LOUISIANA; WALTER L BROWN, JR;
PERRY S BROWN; FSA, L.L.C.

                                    Plaintiffs - Appellees

     v.

MARY ANNA RIVET; MINNA REE WINER; EDMOND G MIRANNE;
EDMOND G MIRANNE, JR

                                    Defendants - Appellants

_____

        Appeal from the United States District Court
            for the Eastern District of Louisiana
_____
                      August 22, 2000
Before KING, Chief Judge, and GARWOOD and DeMOSS, Circuit Judges.

KING, Chief Judge:

     Defendants-Appellants Mary Anna Rivet, Minna Ree Winer,
Edmond G. Miranne, and Edmond G. Miranne, Jr. appeal from the
district court's judgment permanently enjoining them from
relitigating in state court issues and claims regarding a
collateral mortgage that had previously been decided by order of
a federal bankruptcy court and from enforcing two default
judgments.  Defendants-Appellants argue that the Anti-Injunction

Act, 28 U.S.C. § 2283, bars the district court's actions. Although we find that the lower court properly enjoined relitigation of issues and claims regarding the collateral mortgage, we determine that its enjoining enforcement of the default judgments was in error. As a result, we affirm in part and reverse in part.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

At the heart of this case is a collateral mortgage on a leasehold estate granted by Tulane Hotel Investors Limited Partnership ("THILP") to members of the Miranne family (Defendants-Appellants Edmond G. Miranne, Edmond G. Miranne, Jr., Mary Anna Rivet, and Minna Ree Winer, hereinafter "the Mirannes") to secure a $5,000,000 collateral mortgage note.[1]  The leasehold estate was created in 1957, when Lois Stern Brown executed a lease in favor of Pelican State Hotel Corporation.  After a number of subsequent transfers, the leasehold estate was acquired by THILP in September 15, 1983.  On that same date, THILP granted to First Financial Bank[2] a first mortgage on the leasehold to

---

[1]   THILP was described by a district court as the Mirannes' investment vehicle.  See United States ex rel. Minna Ree Winer Children's Class Trust v. Regions Bank, Civ.A.No. 94-4085, 1996 WL 264981, at *1 (E.D. La. May 17, 1996).  Minna Ree Winer is the wife of Edmond Miranne Jr.; Mary Ann Rivet is the wife of Edmond Miranne.

[2]   This Bank apparently was formerly controlled by the Miranne family.  See Minna Ree Winer Children's Class Trust, 1996 WL 264981, at *1.

secure a $15,000,000 collateral mortgage note pledged to the Bank.  On May 2, 1984, THILP granted the Mirannes the second mortgage on the leasehold that forms the basis of the parties' instant dispute.  That mortgage was recorded in the public records on August 17, 1984.

THILP apparently defaulted on its loan to First Financial Bank, causing the Bank to act to enforce its mortgage on the partnership's primary asset, the leasehold estate.  On October 5, 1984, THILP sought protection under Chapter 11 of the Bankruptcy Code.  The bankruptcy court subsequently granted First Financial Bank's motion to convert the proceeding to a Chapter 7 liquidation proceeding and appointed an interim trustee.  In April, 1986, the appointed trustee applied for court approval to sell the leasehold estate at public auction free and clear of all liens, including, specifically, the second mortgage.  The bankruptcy court issued an order advising all creditors and parties in interest of the sale pursuant to 11 U.S.C. § 363(f), and setting a hearing on any objections for June 16, 1986.  THILP objected to the sale.  Edmond Miranne Jr. appeared at the hearing on behalf of himself and Edmond Miranne Sr., as holders of the second mortgage.  On June 17, 1986, the bankruptcy court denied the objection, granted the sale application, authorized the trustee to sell the property, and ordered that the sale would be free and clear of all interests, claims, liens, mortgages and encumbrances, including the Mirannes' second mortgage.  The court

also included in his order the terms of the sale (e.g., there would be a minimum opening bid of $5,250,000), with the listed terms reflecting the provisions of a letter agreement between First Financial Bank and the trustee. THILP appealed from this order and moved for a stay. A hearing was held on the matter, and THILP's motion for a stay was denied by the bankruptcy court and by the district court.

The leasehold was sold at public auction to First Financial Bank for the minimum bid of $5,250,000.[3] On August 14, 1986, the bankruptcy court approved the sale to First Financial free and clear of all encumbrances other than four chattel mortgages. First Financial was ordered to pay $150,000 to the trustee, an amount previously agreed upon, and to pay the auctioneer's fees and costs.[4] The Orleans Parish Recorder of Mortgages was directed by the bankruptcy court to cancel and erase all liens, mortgages, and encumbrances bearing against the property. Nonetheless, the Mirannes contend that the second mortgage remains on the public records.[5]

---

[3] This amount represented 75% of the $7,000,000 appraised value of the property as found by the court in a judgment signed June 9, 1986.

[4] THILP appealed to our court from the bankruptcy court's orders approving the sale of the leasehold. This appeal was dismissed on the basis of 11 U.S.C. § 363(m). See In re: Tulane Investors Ltd. Partnership, No. 86-3836 (5th Cir. June 1, 1987) (unpublished).

[5] Because the first mortgage was not reinscribed after ten years, it was cancelled. See LA. REV. STAT. ANN. 9:5161 (West

On December 29, 1993, Secor Bank, First Financial Bank's successor, purchased from Walter S. Brown, Jr. and Perry L. Brown (members of Lois Stern Brown's family) the fee interest in the property, making Secor the owner of both the property and the leasehold. This caused the lease to cease to exist.[6] Secor immediately conveyed its interest to FSA, the current owner of the property.

On December 29, 1994, the Mirannes filed a "Suit to Enforce Mortgage Via Ordinaria or Alternatively for Damages" in state court against Regions Bank (Secor's successor), Perry Brown, Walter Brown, and FSA, alleging that the Mirannes' superior rights under the second mortgage had been violated by the 1993 transactions. The Mirannes sought payment of their secured debt and to have their mortgage recognized and maintained against the property, and alternatively, sought damages.[7]

---

1991) (allowing for cancellation of inscriptions of mortgages that have not been reinscribed within applicable periods).

[6] As this court noted in Rivet v. Regions Bank, 108 F.3d 576, 581 n.7 (1997) ("Rivet I"), rev'd, 522 U.S. 470 (1998), under Louisiana law, "when a lessor's interest and a lessee's interest in the same immovable property are consolidated in the same person, the lease ceases to exist and the person vested with both interests will hold perfect or full ownership — essentially the equivalent of 'fee simple' title in the common law."

[7] Judge Wiener, writing for the panel in Rivet I, noted that "[i]n their complaint, the Mirannes assiduously avoided any hint of the previous bankruptcy proceedings and orders affecting the leased premises, the leasehold estate, and their second mortgage against it." Rivet I, 108 F.3d at 582.

On February 3, 1995, defendants in the state action (Plaintiffs-Appellees here) removed the case to federal court on grounds of federal question jurisdiction. FSA filed an answer in federal court on February 7, 1995, and the Browns filed answers in federal court on February 14, 1995. The district court denied the Mirannes' motion to remand and granted Regions Bank's motion for summary judgment.

This judgment was appealed to this court, which affirmed the district court's denial of the motion to remand. See Rivet v. Regions Bank of La., F.S.B., 108 F.3d 576 (5th Cir. 1997) ("Rivet I"). The Supreme Court reversed, see Rivet v. Regions Bank of La., 118 S. Ct. 921 (1998), and the case was remanded to state court. The clerk of the district court apparently forwarded only the order of remand to the state court. The answers of the Browns and of FSA were not also forwarded. On August 7, 1998, Regions Bank, FSA, and the Browns filed this action in federal court under the All Writs Act, 28 U.S.C. § 1651, and the relitigation exception to the Anti-Injunction Act, 28 U.S.C. § 2283, seeking preliminary and permanent injunctions against further proceedings in state court.

After this action was filed by Plaintiffs-Appellees, the Mirannes filed in state court a motion for summary judgment against Regions Bank. Three days later, on October 30, 1998, the Mirannes sought preliminary defaults against the Browns and FSA, based on their not having filed answers in state court. On

6

November 4, 1998, a judge, who was not the judge to whom the Mirannes' state-court action had been assigned, confirmed default judgments against the Browns and FSA for $4,688,919.10, and explicitly recognized the second mortgage on the leasehold estate.[8]  Documents filed in support of the default judgments did not mention that FSA and the Browns had filed answers in federal court (stating only that no answers had been filed in state court).  At the ex parte hearing held with regard to the confirmation of default judgments, no mention was made of the answers filed in federal court, or of the leasehold's sale free and clear of all liens.

On January 26, 1999, the district court entered a preliminary injunction, staying further proceedings in state court.  Regions Bank filed a motion for summary judgment to enjoin permanently the Mirannes from relitigating the issues regarding the Mirannes' second mortgage that were resolved by the bankruptcy court.  The Browns and FSA filed a motion for summary judgment to enjoin permanently the Mirannes from prosecuting the state lawsuit, from executing or enforcing the default judgments, and from initiating any other action to recover against them based on the second mortgage.  They also requested that the district court require the Recorder of Mortgages to remove the

---

[8]  The judgment against FSA indicates it is in rem.

default judgments from the public records.  The Mirannes also filed a motion for summary judgment.

The district court determined that the state-court claim involved the same subject matter as the bankruptcy court's orders and thus that the relitigation exception to the Anti-Injunction Act applied.  It also determined that Plaintiffs-Appellees would suffer irreparable injury if the state-action was allowed to proceed, and that conversely, the Mirannes would suffer no injury.  Thus, on April 13, 1999, the court entered judgment in favor of Regions Bank, FSA, and the Browns permanently enjoining the Mirannes from relitigating in state court issues and claims regarding the second mortgage that had been decided by order of the bankruptcy court ("Injunction I"), and further permanently enjoining the Mirannes from enforcing the default judgments entered in state court against the Browns and FSA ("Injunction II").  It denied the Mirannes' motion.  The Mirannes timely appeal.


## II. THE RELITIGATION EXCEPTION

The Mirannes challenge the district court's determination that the relitigation exception to the Anti-Injunction Act applies to this case.  The application of the relitigation exception is an issue of law, and therefore this court reviews de novo the lower court's determination that an injunction may be issued under that exception.  See Next Level Communications LP,

8

v. DSC Communications Corp., 179 F.3d 244, 249 (5th Cir. 1999). We review a lower court's decision to issue a permanent injunction for abuse of discretion. See Peaches Entertainment Corp. v. Entertainment Repertoire Assocs., Inc., 62 F.3d 690, 693 (5th Cir. 1995).

We use a four-part test to determine whether the relitigation exception to the Anti-Injunction Act applies to preclude litigation of a claim in state court: (1) "the parties in a later action must be identical to (or at least in privity with) the parties in a prior action"; (2) "the judgment in the prior action must have been rendered by a court of competent jurisdiction"; (3) "the prior action must have concluded with a final judgment on the merits"; and (4) "the same claim or cause of action must be involved in both suits." New York Life Ins. Co. v. Gillispie, 203 F.3d 384, 387 (5th Cir. 2000) (quoting United States v. Shanbaum, 10 F.3d 305, 310 (5th Cir. 1994)). It is insufficient that a claim or issue could have been raised in the prior action: The relitigation exception requires that the claims or issues that the federal injunction is to insulate from litigation in state proceedings "actually have been decided by the federal court." Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 148 (1988); Texas Commerce Bank Nat'l Ass'n v. State of Florida, 138 F.3d 179, 182 (5th Cir. 1998). We must review both the district court's determination that each of these requirements has been met in the instant case and its conclusion that the

9

principles of equity, comity, and federalism supported its issuance of an injunction. See Regional Properties, Inc. v. Financial & Real Estate Consulting Co., 678 F.2d 552, 566 (5th Cir. 1982) (noting that the Anti-Injunction Act does not "'qualify in any way the principles of equity, comity, and federalism that must [in its absence] restrain a federal court when asked to enjoin a state court proceeding.'" (quoting Mitchum v. Foster, 407 U.S. 225, 243 (1972))).

## A. *Injunction I*

Injunction I bars the relitigation in state court of issues and claims regarding the Mirannes' second mortgage that were decided by the bankruptcy court. The Mirannes dispute that their state-court action involves claims or issues that have been "actually litigated." They present no arguments regarding the other requirements for application of the relitigation exception.

We note that a prior panel of this court examined, inter alia, whether the Mirannes' state-court action involved questions that were "actually litigated" in THILP's bankruptcy proceedings. See Rivet I, 108 F.3d at 590-91. It found it "indisputable that in the 1986 bankruptcy court proceedings the continuing validity of the Mirannes' inferior mortgage was 'actually litigated and decided.'" Id. It was subsequently decided that that panel was without jurisdiction to decide the issues before it, see Rivet v.

10

Regions Bank of La., 118 S. Ct. 921 (1998), and we therefore cannot regard its determinations as binding. Our own examination of the Mirannes' argument, however, leads to the same conclusion.

The Mirannes' state-court action is "in part an *in rem* action to enforce a mortgage against immovable property situated in the Parish of Orleans." A key issue decided by the bankruptcy court was whether that same property — the leasehold estate — should continue to be encumbered by the very lien the Mirannes seek to enforce in state court. Under 28 U.S.C. § 1334(e), the bankruptcy court had exclusive jurisdiction over the leasehold estate. In THILP's bankruptcy proceedings, the trustee determined that the bankruptcy estate would benefit by the sale of the leasehold free and clear of essentially all liens, in part because it was only on these terms that First Financial Bank/Secor Bank/Regions Bank (hereinafter "the Bank") would agree to release its claims and pay the trustee $150,000, which could be distributed to the remaining creditors. The bankruptcy court agreed with the trustee's determination, and authorized a sale pursuant to 11 U.S.C. § 363(f). Creditors were given notice of the sale and the opportunity to be heard. Compare Ray v. Norseworthy, 90 U.S. 128 (1874) (holding that a sale of property purportedly free and clear of liens was ineffective in cancelling the lien held by an individual not given notice of that sale), and Mooney Aircraft Corp. v. Foster (In re Mooney Aircraft,

11

Inc.), 730 F.2d 367, 375 (5th Cir. 1984) ("We recognize that a sale free and clear is ineffective to divest the claim of a creditor who did not receive notice . . . ."), with In re Edwards, 962 F.2d 641 (7th Cir. 1992) (holding that a bona fide purchaser at a bankruptcy sale acquired good title to the debtor's property, despite the mortgagee not having received prior notice of the sale). There is no question that the bankruptcy court had the power to issue orders that stripped liens from the leasehold estate and that extinguished the Mirannes' rights in that property. See Norseworthy, 90 U.S. at 135 ("Beyond all doubt the property of a bankrupt may, in a proper case, be sold by order of the bankrupt court free of incumbrance . . . .").

The Mirannes state that they do not contest the validity of the bankruptcy court's orders when those orders were entered in 1986. Instead, they contend that because those orders were never domesticated and enforced in accordance with Louisiana law, the orders never had force or effect to extinguish the Mirannes' mortgage rights. The Mirannes point to events occurring after entry of the orders and argue that those events enabled them to "revive" their mortgage and to assert their rights under it in the state-court action.[9] In short, the Mirannes assert that

_____

[9] In addition to the failure of the Bank to domesticate and enforce the bankruptcy court's orders in accordance with Louisiana law, the Mirannes assert that two events are particularly important to their ability to enforce their

12

whether they are able to enforce their second mortgage today is a question different from that addressed by the bankruptcy court in 1986.  At the heart of their argument is the assumption that the bankruptcy court's orders were not self-executing.  The orders, rather than effectuating a sale free and clear of all liens, merely gave the Bank a right that required use of state procedures to perfect and enforce.

The Mirannes and the State of Louisiana, as amicus curiae, point to Louisiana Revised Statutes 9:5251[10] and 9:5031,[11] which

---

mortgage.  The first of these events is the reaffirmance of the debt between THILP and the Mirannes.  This was accomplished in April, 1989, when Minna Ree Winer, President, and THILP's general partner, the Tulane Hotel Investors Corporation, signed a document reaffirming the original debt.  The second of the events is the reinscription of the mortgage on the public records in April, 1994.

[10]  Louisiana Revised Statute 9:5251 seeks to preserve rights of mortgage holders by providing that:

> Except as otherwise provided in Civil Code Articles 813 and 815, no conventional or judicial mortgage . . . shall be cancelled, removed from the public records, or in any manner affected by any public or private sale of property subject thereto in . . . bankruptcy . . . proceeding.

> The provisions of this Section shall not apply to the execution of judgments governed by Book IV of the Louisiana Code of Civil Procedure, Article 2251 et seq., or to judicial sales in executory proceedings under the Louisiana Code of Civil Procedure, Article 2631 et seq.

LA. REV. STAT. ANN. § 9:5251 (West Supp. 2000).

[11]  Louisiana Revised Statute 9:5031 seeks to protect rights of lien holders by providing that:

13

purportedly prevent any public sale of property in bankruptcy

from affecting "in any manner" any conventional mortgage or lien

on that property, and argue that under these statutes, the Bank

was required to use state domestication and enforcement

procedures to remove the Mirannes' mortgage and to truly hold the

leasehold free and clear of that mortgage.  The State of

Louisiana states that the purpose of the statutes is

> to avoid putting the Recorder in a <u>quasi</u> judicial role
> by calling on him to determine, <u>inter alia</u>, whether the
> judgment was validly entered, whether jurisdiction
> existed in the rendering court, whether the holder of
> the mortgage had been afforded notice and a fair
> opportunity to be heard, whether or not the right to
> enforce the judgment had lapsed under Louisiana law,
> and so on.  Th[e] tried and true Louisiana procedure
> [listed in the statutes] provides for a Louisiana
> District Court Judge, and not a Parish Recorder, to
> decide whether these various legal niceties have been
> observed, and, therefore, whether a foreign judgment is
> entitled to enforcement in Louisiana.

Amicus Brief, at 12.  The implication of this language is clear —

if a Louisiana District Court Judge determines that one or more

of the listed "legal niceties" have not been observed, then the

order is not enforced in Louisiana.  But, in relevant part,

---

> No lien . . . shall be cancelled, removed from the
> public records, or in any manner affected by any public
> or private sale of property subject thereto in any . .
> . bankruptcy . . . proceeding.  However, the provisions
> of this Section shall not apply to the execution of
> judgments governed by Book IV of the  Louisiana Code of
> Civil Procedure, Article 2251 et seq., or to judicial
> sales in executory proceedings under the Louisiana Code
> of Civil Procedure, Articles 2631 et seq.

LA. REV. STAT. ANN. § 9:5031 (West 1991).

14

whether the above-listed "legal niceties" were observed in the sale of the leasehold estate to the Bank was determined by the bankruptcy court and by the district court.[12]

The Mirannes contend that our recent decision in <u>Davis v. Davis (In re Davis)</u>, 170 F.3d 475 (5th Cir.) (en banc), <u>cert. denied</u>, 120 S. Ct. 67 (1999), supports their position that despite the provisions of the Bankruptcy Code and the language of the bankruptcy court's orders, the Bank was obligated to use state procedures to enforce its right to hold the leasehold estate free and clear of the Mirannes' lien. They rely on portions of <u>Davis</u>' language to argue that § 363(f) does not pre-empt Louisiana property law and enforcement provisions. Although we are inclined to disagree with this,[13] we need not decide the question here. We find little in <u>Davis</u> that applies directly to the instant case. Unlike the plaintiff in <u>Davis</u>, the Bank is not a judgment creditor. The bankruptcy court's orders in this case

---

[12] The trustee supplied the bankruptcy court with evidence that creditors had been notified of the proposed sale. At several points during the proceedings related to the sale, THILP challenged that sale, arguing, <u>inter alia</u>, that the bankruptcy court did not have jurisdiction over the property, that the requirements of § 363(f) had not been met, and that the sale was enjoined by state law.

[13] We note, for example, that the language of § 363(f), by allowing a trustee to sell a debtor's property free and clear of all liens, would seem to be in direct conflict with the language of the Louisiana statutes, which state that mortgages will not "in any manner" be affected by a public sale in bankruptcy. <u>See</u> <u>Davis</u>, 170 F.3d at 482 ("[P]reemption may be implied if state and federal laws conflict . . . .").

involved a sale of property determined to be within the court's jurisdiction. Unlike the plaintiff in Davis, who sought to use § 522(c) of the Bankruptcy Code to collect a non-discharged debt, the Bank did not need to take further steps to "execute" the bankruptcy court's orders.

The Mirannes' argument that the questions they raise in their state-court action are different from those resolved by the bankruptcy court must be rejected. Once the sale of the leasehold occurred and was approved, title was transferred, as ordered (free and clear of all liens). See In re Whatley, 155 B.R. 775, 781 (D. Colo. 1993) (holding that orders authorizing a sale free and clear of liens and confirming that sale were self-executing and did not require "any enforcement proceedings in order to bring them to fruition"), aff'd, 169 B.R. 698 (D. Colo. 1994), aff'd, 54 F.3d 788 (10th Cir. 1995). If a bankruptcy court's orders authorizing and approving a sale free and clear of liens were not self-executing, it would seemingly be impossible to have the liens attach to the sale proceeds. See, e.g., 11 U.S.C. § 1129(b)(2)(A)(ii) (providing that a "fair and equitable plan" includes those that sell property free and clear of liens, have those liens attach to the proceeds of such sale, and meet other requirements regarding the treatment of those liens on the proceeds); S. REP. No. 95-989, at 56 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5842 ("Most often, adequate protection in connection with a sale free and clear of other interests will be

16

to have those interests attach to the proceeds of the sale."). Orders that were not self-executing would also be inconsistent with the Code's emphasis on the finality of sales. See, e.g., 11 U.S.C. § 363(m); Edwards, 962 F.2d at 643 (noting that "[i]f purchasers at judicially approved sales of property of a bankrupt estate, and their lenders, cannot rely on the deed that they receive at the sale, it will be difficult to liquidate bankrupt estates at positive prices"); Bleaufontaine, Inc. v. Roland Int'l (In re Bleaufontaine, Inc.), 634 F.2d 1383, 1389 n.10 (5th Cir. Unit B 1981) ("If deference were not paid to the policy of speedy and final bankruptcy sales, potential buyers would not even consider purchasing any bankrupt's property. As a result, the bankrupt's creditors would be the ones most injured thereby.").

As was noted in Rivet I, "[f]or the bankruptcy court in the instant case to authorize and approve the sale of the leasehold estate free and clear of essentially all liens and encumbrances, that court necessarily had to decide whether the Mirannes' inferior second mortgage could survive as an encumbrance against the leasehold estate after that estate was sold at public auction by the THILP trustee's foreclosure on the superior first mortgage." 108 F.3d at 590. The Mirannes' state-court action represents an attempt to use subsequent events to "revive" and enforce a mortgage on property that had been conclusively stripped of the Mirannes' lien in 1986. Because the Mirannes' state-court action necessarily requires relitigation of the

17

precise question resolved by the bankruptcy action, i.e., the survival of the Mirannes' mortgage as an encumbrance on the leasehold estate, we agree with the district court that the relitigation exception applies in this case.

We also find that the district court did not abuse its discretion in issuing Injunction I. It specifically determined that the Plaintiffs-Appellees would suffer irreparable injury if the Mirannes were allowed to proceed, and that the Mirannes, "who have always been aware of the bankruptcy court's orders to discharge the underlying debt and to sell the property free and clear of the mortgage," and who have "nevertheless attempted to obtain a judgment from a state court in flagrant disregard of the bankruptcy court's orders," would not be injured by an injunction. With respect to Injunction I, we have no cause to disagree with this conclusion.[14]

---

[14] The Mirannes also argue that the district court's actions impermissibly encroach on state sovereignty, citing, among other cases, the Supreme Court's recent Eleventh Amendment decisions in support of their contentions. The crux of the Mirannes' argument appears to be that the district court's actions infringe on the states' "absolute Constitutional authority to judge the existence of real property interests within their borders." Although states have the power to define property interests, it is clear that the Constitution also provides Congress with the authority to establish procedures for the transfer of those interests within the context of bankruptcies. See U.S. CONST. art. I, § 8, cl. 4 (giving Congress the authority to establish uniform laws on the subject of bankruptcies in the United States); International Shoe Co. v. Pinkus, 278 U.S. 261, 264 (1929) ("The power of Congress to establish uniform laws on the subject of bankruptcies throughout the United States is unrestricted and paramount. . . . The national purpose to establish uniformity necessarily excludes

18

B.  *Injunction II*

We find we must reach a different conclusion with respect to Injunction II.  That injunction bars the Mirannes' enforcement of default judgments, entered by the Civil District Court for the Parish of Orleans, against FSA and the Browns.  The Mirannes' challenge to the issuance of Injunction II has two main prongs: They assert that the district court had no subject-matter jurisdiction over FSA's and the Browns' claims and that the court's action is inconsistent with the commands of Parsons Steel, Inc. v. First Alabama Bank, 474 U.S. 518 (1986).  We address first the question of subject-matter jurisdiction.

The Mirannes assert the district court did not have subject-matter jurisdiction over the action brought by FSA and the Browns because "as to them there was no federal element in the State Action."  The Mirannes contend that the only way a state court defendant becomes entitled to the protection of the Anti-Injunction Act is to have raised the affirmative defense of res judicata in the state-court proceedings.  Because there is no affirmative defense of res judicata on file in the state

---

state regulation. . . . States may not pass or enforce laws to interfere with or complement the Bankruptcy Act or to provide additional or auxiliary regulations.").

19

action,[15] FSA and the Browns are not entitled to the protections of the Act.

We emphatically reject this argument. Neither the All Writs Act nor the Anti-Injunction Act is jurisdictional. See Southwest Airlines Co. v. Texas Int'l Airlines, Inc., 546 F.2d 84, 89 (5th Cir. 1977) (Anti-Injunction Act); Brittingham v. Commissioner, 451 F.2d 315, 317 (5th Cir. 1971) (All Writs Act). Instead, jurisdiction is based on the original case (here the bankruptcy proceeding). It is not necessary for the district court to have jurisdiction over the second suit as an original action. See Royal Ins. Co. v. Quinn-L Capital Corp., 960 F.2d 1286, 1292 (5th Cir. 1992) ("[A] federal district court can exercise ancillary jurisdiction over a second action in order to secure or preserve the fruits and advantages of a judgment or decree rendered by that court in a prior action." (internal quotation marks omitted)); id. (noting that jurisdiction exists "even where the federal district court would not have jurisdiction over the second action if it had been brought as an original suit"); see also Local Loan Co. v. Hunt, 292 U.S. 234, 239 (1934); In re Mooney, 730 F.2d at 374. Because the court below was the court in which the bankruptcy proceedings were conducted, it had

---

[15] This is due to FSA's and the Browns' answers filed in federal court not being transferred to the state court upon remand.

20

subject-matter jurisdiction over the claims of FSA and the Browns.

We turn now to the Mirannes' Parsons Steel argument.  They contend that because the district court did not consider the preclusive effect of the default judgments, and certainly did not give the judgments the preclusive effect they deserved, it erred in issuing Injunction II.  See Parsons Steel, 474 U.S. at 525. The Supreme Court held in Parsons Steel that "the Full Faith and Credit Act requires that federal courts give the state-court judgment, and particularly the state court's resolution of the res judicata issue, the same preclusive effect it would have had in another court of the same State."  474 U.S. at 525.  We read the Court's language to require that we assess whether a state court has issued a final decision that operates to bar re-assessment of the preclusive effect of a prior federal action. We therefore confront two questions in the context of this case: whether the default judgments in this case are final judgments, and if final judgments, whether they bar our re-assessment of the res judicata issue.  As the Parsons Steel Court noted, we must look to state law for the answers to both of these questions. Id.

Our analysis of the question whether the default judgments are final judgments under Louisiana law provides us with no definitive answer.  On one hand, the language of article 1915(B) of the Louisiana Code of Civil Procedure suggests that the

21

default judgments, because they were issued against fewer than all the parties in the original action, are not final judgments.[16]  On the other hand, FSA and the Browns, in filing actions in state court challenging the validity of the default judgments, have acted as though the judgments are final.  Our research uncovered no case that has applied the language of article 1915 to hold that default judgments issued against fewer than all the parties are not final judgments.  The Mirannes contend that that article is not applicable to the instant case,

---

[16]  At the time the Mirannes filed their state-court action, article 1915(B) of the Louisiana Code of Civil Procedure provided:

> (1) When a court renders a partial judgment . . . as to one or more but less than all of the . . . parties, . . . the judgment shall not constitute a final judgment unless specifically agreed to by the parties or unless designated as a final judgment by the court after an express determination that there is no just reason for delay.
> (2) In the absence of such a determination and designation, any order or decision which adjudicates fewer than all claims or the rights and liabilities of fewer than all the parties, shall not terminate the action as to any of the claims or parties and shall not constitute a final judgment for the purpose of an immediate appeal.  Any such order or decision issued may be revised at any time prior to rendition of the judgment adjudicating all the claims and the rights and liabilities of all the parties.

LA. CODE CIV. PROC. ANN. art. 1915(B) (West 1998).

22

but also acknowledge, as they must, a degree of confusion in the extant cases.[17]

If we were to conclude that the default judgments were final judgments, we would still face the preclusion question.  Under Louisiana law, judgments that suffer from "vices of form" do not preclude relitigation of the claims or issues because such judgments are null and void.[18]  See Kelty v. Brumfield, 633 So.2d 1210, 1215 (La. 1994); Murdock v. Brittco, Inc., 517 So.2d 898, 902 (La. Ct. App. 1987) ("Since service . . . was not made in accordance with law, it follows that the proceedings which resulted in the default judgment . . .  were null, void and of no

---

[17]  The Louisiana Legislature amended Article 1915(B) in 1999 to "eliminate confusion with Article 1915(A)." The amendment, which eliminated the term "parties," was made applicable to cases filed on or after January 1, 2000.  See 1999 La. Acts 1263 § 3.

[18]  Default judgments will be declared null and void if they suffer from any of the defects listed in Louisiana Code of Civil Procedure art. 2002:

A. A final judgment shall be annulled if it is rendered:
   (1)  Against an incompetent person not represented as required by law.
   (2)  Against a defendant who has not been served with process as required by law and who has not waived objection to jurisdiction, or against whom a valid judgment by default has not been taken.
   (3)  By a court which does not have jurisdiction over the subject matter of the suit.
B. Except as otherwise provided in Article 2003, an action to annul a judgment on the grounds listed in this Article may be brought at any time.

LA. CODE CIV. PROC. ANN. art. 2002 (West 1990).

23

effect"). Judgments that suffer from "vices of substance" may be annulled as well. See LA. CODE CIV. PROC. art. 2004 (West 1990) (providing that "[a] final judgment obtained by fraud or ill practices may be annulled").

FSA and the Browns have filed petitions in state court seeking to have their default judgments declared null and void, arguing that those judgments suffer from vices of form and of substance. See LA. CODE CIV. PROC. art. 2002; 2004. In addition, Perry Brown has filed a motion for a new trial. FSA and the Browns point to a number of facts that they argue render the default judgments invalid, including (1) the failure to serve Walter Brown while the state court had jurisdiction over the Mirannes' case; (2) the failure of Mirannes' counsel to inform FSA or the Browns of the intent to seek default judgments; (3) the failure of Mirannes' counsel to inform the judge issuing the default judgments that FSA and the Browns had in fact filed answers after the case was removed to federal court;[19] (4) the failure of the Mirannes' counsel to inform the judge of the lengthy history of this case and of the efforts made by FSA and the Browns to defend themselves against the demands made by the Mirannes; (5) the failure of the Mirannes' counsel and of Edmond

---

[19] The Mirannes' counsel has admitted to not informing the judge of the answers FSA and the Brown filed in federal court.

24

Miranne Jr.[20] to inform the judge of the bankruptcy court's orders or the leasehold's sale free and clear of the Mirannes' lien; (6) the failure of the Mirannes' counsel to inform the judge of the ongoing proceedings for injunctive relief in federal court; and (7) the falsity of Edmond Miranne Jr.'s testimony at the default judgment hearing as the mortgage he testified was recorded at the time had in fact been cancelled.

FSA argues that we may look to these facts as a basis for a conclusion that the default judgments, if final judgments, do not have preclusive effect. But this means we would be deciding the same questions that the state court has been asked to decide. Thus, under the circumstances, our task under Parsons Steel requires that we predict whether that state court would declare the judgments nullities under Louisiana Code of Civil Procedure article 2002, would exercise its discretion and set the judgments aside under article 2004, or rule that the judgments are valid.

We find that the principles of comity and federalism counsel against making such predictions, given the existence of FSA's and the Browns' state-court actions. The Louisiana state court is in

---

[20] Edmond G. Miranne, Jr. testified at the ex parte hearing conducted regarding confirmation of the default judgments. The only mention of the transfer of the property from THILP to the Bank occurs on page 12 of the hearings transcript. Mr. Miranne described the sale as follows:

> There was a sale by Tulane Hotel Investors Limited Partnership to what was then First Financial Bank, FSB, which through a couple of mergers and name changes, is now Regions Bank.

25

the best position to determine whether the default judgments should be declared nullities under state law.  Thus, although we view the facts that FSA and the Browns present as compelling, we nonetheless determine it best to refrain from drawing any conclusion regarding the judgments' preclusive effect under the circumstances present here.  As the Supreme Court advised long ago, federal courts should decline to issue an injunction against state-court proceedings if there are any doubts as to its propriety.  See Atlantic Coast Line R.R. Co. v. Brotherhood of Locomotive Eng'rs, 398 U.S. 281, 297 (1970) ("Any doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy.").  Given the circumstances of this case, we conclude that we must reverse the district court's judgment with respect to Injunction II.

This is not a felicitous result.  The default judgments' recognition of the Mirannes' mortgage is in direct conflict with the bankruptcy court's orders, and we certainly would not advocate that others use the means apparently employed here to obtain such judgments.  But our displeasure with the outcome with respect to Injunction II cannot be used to uphold its issuance. Cf. id. at 294 (noting that a federal court cannot issue an injunction "merely because [state court proceedings] interfere with a federal protected right or invade an area preempted by

26

federal law, even when the interference is unmistakably clear"). Federal courts assessing whether to enjoin state-court proceedings must also assess whether principles of comity and federalism counsel restraint.  See Parsons Steel, 474 U.S at 526; Mitchum, 407 U.S. at 243.  Our respect for the state court moves us to leave to it questions related to the validity and enforceability of the default judgments under Louisiana law.

## III.  CONCLUSION

For the foregoing reasons, we affirm the district court's judgment as it relates to the injunction barring the Mirannes' relitigating in state court issues and claims covered by the bankruptcy court's orders, and reverse the court's judgment as it relates to the injunction barring the enforcement of the default judgments issued against FSA and the Browns.

AFFIRMED in part; REVERSED in part.  The Defendants-Appellants shall bear the costs of this appeal.